UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X
                                    :
UNITED STATES OF AMERICA            :        **SUPERSEDING INDICTMENT**
                                    :
        - v. -                      :        S1 11 Cr. 111 (NRB)
                                    :
MAROUN SAADE,                       :
WALID NASR,                         :
    a/k/a "David Nasr,"             :
FRANCIS SOUROU AHISSOU,             :
    a/k/a "Francois,"               :
CORNEILLE DATO,                     :
    a/k/a "Pablo,"                  :
MARTIN RAOUF BOURAIMA,              :
    a/k/a "Raul,"                   :
ALWAR POURYAN,                      :
    a/k/a "Allan,"                  :
    a/k/a "Alberto," and            :
ODED ORBACH,                        :
    a/k/a "Dedy,"                   :
    a/k/a "Jesse,"                  :
                                    :
        Defendants.                 :
- - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3|22|11
```

COUNT ONE

NARCO-TERRORISM CONSPIRACY

     The Grand Jury charges:

THE TALIBAN

     1.  The Taliban is a radical religious movement that
ruled over much of Afghanistan beginning in the mid-1990s.  While
in power, the Taliban imposed on Afghanistan a totalitarian form
of government, based on a strict version of Islamic religious law
known as Sha'ria.  Among other things, the Taliban imposed severe
limits on ordinary Afghanis.  Women were permitted to work, if at
all, only in a very narrow range of occupations, and girls were
formally forbidden from attending school.  Televisions, audio

cassettes, and use of the Internet were banned, as was the possession of photographs. Prisoners were often tortured; religious police carried out public killings as punishment for, among other things, adultery; and conversion from Islam to other religions was punishable by death.

2. The Taliban was driven from power in late 2001, during the course of a United States-led invasion of Afghanistan. The United States and its allies invaded Afghanistan because the Taliban was or had been sheltering the senior leadership of al Qaeda, an international terrorist organization. Since being removed from power in 2001, the Taliban has operated as a violent insurgent organization — bent on driving the United States and its allies from Afghanistan, and re-imposing Taliban rule. To further its goals, the Taliban has resorted to armed violence: car bombings, suicide strikes, rocket attacks, kidnappings, and murder. Substantial numbers of American soldiers and civilians have been killed in Afghanistan since 2001 by the Taliban — and, on a number of occasions, the Taliban has publicly claimed credit for such killings. Taliban fighters have employed various and increasingly sophisticated weaponry against United States and ally forces, including, among others, improvised explosive devices ("IEDs"), automatic firearms, rocket propelled grenades ("RPGs"), and surface-to-air missiles ("SAMs"). In fact, on multiple occasions the Taliban has claimed responsibility for

-2-

successfully shooting down American aircraft by means of surface-to-air missiles, some of which have also resulted in human casualties.

<u>The Defendants</u>

3.   At all times relevant to this Indictment, MAROUN SAADE, the defendant, was a narcotics trafficker operating in West Africa, who agreed to facilitate the transportation and distribution of vast quantities of cocaine in West Africa. Together with his co-conspirators, SAADE communicated with individuals whom he believed to be representatives and/or associates of the Taliban, but were, in fact, confidential sources working for the Drug Enforcement Administration ("DEA") (the "CSs"), and agreed to:

(a)   receive and store multi-ton shipments of Taliban-owned heroin in Benin, a country in West Africa, and transport that heroin to Ghana, where portions of those shipments would be sent by commercial airplane to the United States to be sold for the financial benefit of the Taliban;

(b)   sell to the CSs multi-kilogram loads of cocaine and transport them to Ghana, where portions of those loads would be sent by commercial airplane to the United States to be sold for the financial benefit of the Taliban;

(c)   assist in transferring the proceeds from the narcotics sales from the United States to West Africa, where they

could be used by the CSs to purchase weapons for the Taliban to fight American military forces in Afghanistan;

        (d)   introduce these CSs to arms traffickers who could provide them with the weapons they wished to purchase for the Taliban, including surface-to-air missiles.

        4.   At all times relevant to this Indictment, WALID NASR, a/k/a "David Nasr," the defendant, was a close associate of MAROUN SAADE, the defendant, who assisted SAADE with his narcotics trafficking activity with the CSs, understanding that such activity was to benefit the Taliban.

        5.   At all times relevant to this Indictment, FRANCIS SOUROU AHISSOU, a/k/a "Francois," the defendant, was a cocaine broker and transporter in West Africa, whom MAROUN SAADE, the defendant, introduced to the CSs to broker cocaine purchases, and who understood that such activity was to benefit the Taliban.

        6.   At all times relevant to this Indictment, CORNEILLE DATO, a/k/a "Pablo," the defendant, was a narcotics trafficker in West Africa with contacts at the port at Cotonou, Benin, whom MAROUN SAADE, the defendant, recruited to assist the CSs with unloading the Taliban-owned heroin shipments and to broker purchases of cocaine, and who understood that such activity was to benefit the Taliban.

        7.   At all times relevant to this Indictment, MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendant, was a narcotics

-4-

transporter in West Africa, who worked with MAROUN SAADE, the defendant, and whose role was to transport the heroin and cocaine to storage houses in Cotonou, Benin, and from there to Ghana, understanding that such activity was to benefit the Taliban.

8.   At all times relevant to this Indictment, ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," the defendant, was an arms trafficker represented by MAROUN SAADE, the defendant, to have ties to Hezbollah, a terrorist organization located in Lebanon, who was introduced to the CSs by SAADE, and who agreed to provide weapons, including surface-to-air missiles, to the CSs for use by the Taliban.

9.   At all times relevant to this Indictment, ODED ORBACH, a/k/a "Dedy," a/k/a "Jesse," the defendant, was an arms trafficker who worked with ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," the defendant, and who agreed to provide weapons, including surface-to-air missiles, to the CSs for use by the Taliban.

STATUTORY ALLEGATIONS

10.   From at least in or about June 2010, up to and including in or about February 2011, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, MAROUN SAADE, WALID NASR, a/k/a "David Nasr," FRANCIS SOUROU AHISSOU, a/k/a "Francois," CORNEILLE DATO, a/k/a "Pablo," and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the

defendants, at least one of whom was first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate Title 21, United States Code, Section 960a.

11.   It was a part and an object of said conspiracy that MAROUN SAADE, WALID NASR, a/k/a "David Nasr," FRANCIS SOUROU AHISSOU, a/k/a "Francois," CORNEILLE DATO, a/k/a "Pablo," and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendants, and others known and unknown, would and did engage in conduct that would be punishable under Title 21, United States Code, Section 841(a) if committed within the jurisdiction of the United States, to wit, the distribution, and possession with the intent to distribute, of five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorist activity and terrorism, to wit, the Taliban and its members, operatives and associates, having knowledge that said person and organization has engaged in and engages in terrorism and terrorist activity, which activity violates the criminal laws of the United States, occurs in and affects foreign commerce, and causes and is designed to cause death and serious bodily injury to nationals of the United States while the nationals are outside

-6-

the United States, and substantial damage to the property of a legal entity organized under the laws of the United States while that property is outside of the United States, in violation of Section 960a of Title 21, United States Code.

12.   It was a further part and an object of said conspiracy that MAROUN SAADE, WALID NASR, a/k/a "David Nasr," CORNEILLE DATO, a/k/a "Pablo," and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendants, and others known and unknown, would and did engage in conduct that would be punishable under Title 21, United States Code, Section 841(a), if committed within the jurisdiction of the United States, to wit, the distribution, and possession with the intent to distribute, of one kilogram and more of mixtures and substances containing a detectable amount of heroin, knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorist activity and terrorism, to wit, the Taliban and its members, operatives and associates, having knowledge that said person and organization has engaged in and engages in terrorism and terrorist activity, which activity violates the criminal laws of the United States, occurs in and affects foreign commerce, and causes and is designed to cause death and serious bodily injury to nationals of the United States while the nationals are outside the United States, in violation of Section 960a of Title 21,

United States Code.

<u>Overt Acts</u>

13.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed.

a.   On or about June 26, 2010, in Ghana, MAROUN SAADE, WALID NASR, a/k/a "David Nasr," and FRANCIS SOUROU AHISSOU, a/k/a "Francois," the defendants, participated in a consensually recorded meeting with two DEA confidential sources ("CS-1" and "CS-2"), who purported to represent the Taliban, to discuss whether SAADE, NASR, and AHISSOU could provide them with multiple kilogram quantities of cocaine, the proceeds of which would be used to benefit the Taliban.   SAADE stated, in substance and in part, that he could supply CS-2 with large quantities of Colombian cocaine and that AHISSOU would be responsible for negotiating the sale of the cocaine.   During the meeting, CS-2 also told SAADE and NASR that the Taliban were interested in setting up a transportation route for their heroin from Pakistan through West Africa.   SAADE told CS-2 that he could receive the heroin and store it in houses in West Africa.

b.   On or about July 2, 2010 and July 5, 2010, SAADE engaged in a series of consensually recorded telephone calls with CS-1, in which they further discussed the proposed heroin shipment.

c.    On or about August 15, 2010, NASR engaged in a consensually recorded telephone call from CS-1.  During the call, CS-1 asked NASR if SAADE had kilograms of cocaine available.  NASR told CS-1 that SAADE had more than 1000 kilograms.  NASR also told CS-1 that CS-1 could negotiate the price of the cocaine with SAADE when he/she met with SAADE in Ghana.

d.    On or about August 16, 2010, SAADE engaged in a consensually recorded telephone call from CS-2.  During the call, CS-2 told SAADE that he/she would send CS-1 to Ghana to meet with SAADE to purchase a one kilogram sample of cocaine.  CS-2 also told SAADE that he/she was interested in buying several hundred kilograms of cocaine in the future, if the sample was acceptable.

e.    On or about August 20, 2010, SAADE engaged in a consensually recorded telephone call from CS-1.  During the call, CS-1 told SAADE that he/she would be in Ghana on August 24, 2010.  CS-1 further told SAADE that CS-2 wanted CS-1 to negotiate the price of the kilogram.  SAADE told CS-1 that he would let CS-1 negotiate the price with the people who would deliver the kilogram.  SAADE further told CS-1 that he would send AHISSOU to meet CS-1 in Ghana.

f.    On or about August 24, 2010, in Ghana, AHISSOU participated in a consensually recorded meeting with CS-

-9-

1.   During the meeting, CS-1 told AHISSOU that CS-2 wanted to export heroin from Pakistan and Afghanistan and wanted to establish a base of operations in West Africa to store the heroin so that it could be sent to the United States, Canada, and Europe to be sold to customers.  CS-1 further told AHISSOU that CS-2 was a member of the Taliban and that the Taliban would receive the proceeds from the sale of the heroin.  AHISSOU agreed to try to find someone who could help transfer the drug proceeds out of the United States.

g.   On or about August 25, 2010, in Ghana, AHISSOU and NASR participated in a consensually recorded meeting with CS-1.  During the meeting, CS-1, NASR, and AHISSOU discussed future purchases of cocaine.  CS-1 stated that CS-2 would purchase approximately 300-500 kilograms of cocaine after receiving the sample.  CS-1 indicated that it would be the responsibility of SAADE, NASR, and AHISSOU to get the cocaine into West Africa and that it would be CS-2's responsibility to get the cocaine out of West Africa.  SAADE, NASR, and AHISSOU agreed.  NASR further explained that once the cocaine arrived in West Africa, he, SAADE, and AHISSOU would rent several houses and store roughly 200-300 kilos of cocaine in each house.

h.   On or about August 29, 2010, in Ghana, SAADE participated in a consensually recorded meeting with CS-1 and CS-2.  During the meeting, CS-2 told SAADE that he/she had made

-10-

arrangements with the Taliban to send approximately two tons of heroin to Cotonou, Benin by boat and that he/she needed SAADE to store it.  CS-2 further explained to SAADE that CS-2 needed SAADE's assistance transporting the heroin from Benin to Ghana, where the heroin could be loaded onto commercial airline flights bound for New York.  SAADE told CS-1 and CS-2 that he could handle the storage and transportation.  CS-1 and CS-2 further told SAADE that all of the proceeds from the heroin sales in the United States would be going back to the Taliban and that they would use it to fight the Americans.  SAADE responded that it would please him to support the Taliban's cause and stated that he had associates in the United States who could transfer the drug proceeds to West Africa.

       i.    On or about August 29, 2010, SAADE participated in a consensually recorded meeting with CS-1 and CS-2.  At that meeting, CS-1, CS-2, and SAADE had further discussions about the heroin shipment, the storage facilities and transportation that SAADE would arrange, and laundering the drug proceeds back from the United States.  Shortly thereafter, CS-1 provided SAADE with $1,000 to cover expenses.

       j.    On or about September 4 and 8, 2010, SAADE participated in three consensually recorded telephone calls with CS-1.  During these conversations, SAADE informed CS-1 that there were approximately 300 kilograms of cocaine in Cotonou, Benin,

and that he needed to know from CS-1 how much to purchase.  CS-1
and SAADE also discussed the heroin shipment.  SAADE told CS-1
that he would find a solution for CS-2 regarding how to safely
transfer the heroin out of Africa.

k.   On or about October 5, 2010, in Benin, SAADE
and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendant,
participated in a consensually recorded meeting with CS-1 and CS-
2.  SAADE discussed the heroin shipment and explained how he
would unload the heroin from the ship offshore using smaller
fishing boats, and then transport the drugs to the storage
houses, where NASR would be in charge of its security.  SAADE
indicated that BOURAIMA would be driving the drugs to the storage
houses.  CS-1 explained to SAADE that the Taliban would use the
drug proceeds to buy weapons to fight the Americans.  CS-1 asked
SAADE if he knew anyone that could supply weapons, including
anti-aircraft missiles.  SAADE told CS-1 that he would inquire
about getting anti-aircraft missiles and other weapons from
Hezbollah in Lebanon.  After the meeting, CS-1, CS-2, SAADE, and
BOURAIMA traveled by car to inspect several different houses that
would be used to store the heroin.

l.   On or about October 6, 2010, in Benin, SAADE,
BOURAIMA, and CORNEILLE DATO, a/k/a "Pablo," the defendant,
participated in a consensually recorded meeting with CS-1 and CS-
2.  During the meeting, SAADE introduced DATO as someone with

-12-

whom he had worked in the past and who could provide security for the drugs because of his contacts with an individual who managed the harbor and the airports in Benin.  DATO told CS-2 that SAADE had informed him that CS-2 wanted to move heroin into West Africa by ship.  DATO discussed buying a fishing boat which could unload the ship containing the heroin offshore.  At the close of the meeting, CS-1 told DATO and BOURAIMA that CS-1 and CS-2 would be sending the heroin to New York and that it would be their responsibility to get the drugs to the airplanes.  DATO and BOURAIMA acknowledged that they understood.

          m.   On or about October 7, 2010, in Benin, DATO and BOURAIMA participated in a consensually recorded meeting with CS-1 and CS-2.  CS-1 explained to DATO that CS-2 was with the Taliban and that CS-2 had a large quantity of heroin that he/she wanted to send to the United States, and in particular, to New York.  CS-1 later told DATO and BOURAIMA that SAADE's contacts in the United States would transfer the drug proceeds back to West Africa where it would be used to buy weapons, and that SAADE had already been in contact with Hezbollah in Lebanon to arrange the weapons purchase.  DATO and BOURAIMA indicated that they understood.  DATO also stated that he could send as much as one ton or more of cocaine to Cotonou, Benin and then transfer it to Ghana, where CS-2 could arrange for it to be put on commercial flights to New York.

n.   On or about October 11, 2010, in Benin,
SAADE, NASR, and AHISSOU participated in a consensually recorded
meeting with CS-1.  CS-1 explained to SAADE and NASR that CS-2
and the Taliban wanted to send someone to meet with the arms
dealers in Africa.  SAADE said he could arrange the meeting and
further told CS-1 that CS-2 needed to send him a list of the
weapons he/she wanted.

o.   On or about October 13, 2010, in Benin,
SAADE, NASR, and AHISSOU participated in a consensually recorded
meeting with CS-1.  At this meeting, SAADE, NASR, and AHISSOU
took CS-1 to an individual identified as "Mohammed," who brought
SAADE, NASR, AHISSOU and CS-1 to a house, where CS-1 purchased
approximately 800 grams of cocaine for approximately $20,700 in
cash.

p.   On or about November 18, 2010, in Ghana,
SAADE and NASR participated in a consensually recorded meeting
with CS-1 to discuss the upcoming meeting with the arms dealers.
SAADE told CS-1 one of the people he/she would meet with was a
member of Hezbollah from Lebanon and the other was someone who
sold weapons to Hezbollah.  SAADE further told CS-1 that they
could sell them, among other things, anti-tank missiles, C4
explosives, and night vision equipment.

q.   On or about November 20, 2010, in Ghana,
SAADE, NASR, ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," the

-14-

defendant, and another unidentified individual participated in a consensually recorded meeting with CS-1 and two other DEA confidential sources ("CS-3" and "CS-4").  CS-3 told POURYAN that he/she and CS-4 worked for the Taliban and that the Taliban wanted modern weapons and training to be able to protect their heroin laboratories and to destroy American tanks.  POURYAN discussed providing surface-to-air missiles ("SAMs"), anti-tank missiles, grenade launchers, AK-47s, M-16s, and other weapons, and discussed delivery and payment.

      r.  On or about January 6, 2011, AHISSOU engaged in a consensually recorded telephone call with CS-1 in which CS-1 informed AHISSOU that the cocaine sample purchased on or about October 13, 2010 had successfully reached the United States via a commercial airline flight from Ghana.

      s.  On or about January 6, 2011, BOURAIMA engaged in a consensually recorded telephone call with CS-1 in which CS-1 informed BOURAIMA that the heroin shipment would arrive within the next few weeks and confirmed BOURAIMA's assistance in transporting both the cocaine and heroin to the airport in Ghana so that it could be sent to the United States via a commercial airline flight.

      t.  On or about January 19, 2011, AHISSOU engaged in a consensually recorded telephone call with CS-1 in which AHISSOU stated that he could assist in transferring the proceeds

from narcotics sales from the United States to Africa.  CS-1

informed AHISSOU that the proceeds were needed by CS-2's

organization to purchase weapons, including SAMs, to protect

their laboratories from American air attack.

> (Title 21, United States Code, Section 960a and
> Title 18, United States Code, Section 3238.)

## COUNT TWO

### COCAINE IMPORTATION CONSPIRACY

The Grand Jury further charges:

14.  The allegations set forth in Paragraphs One

through Thirteen above are incorporated by reference as if set

forth fully herein.

15.  From at least in or about June 2010, up to and

including in or about February 2011, in an offense committed

outside the territorial jurisdiction of the United States, MAROUN

SAADE, WALID NASR, a/k/a "David Nasr," FRANCIS SOUROU AHISSOU,

a/k/a "Francois," CORNEILLE DATO, a/k/a "Pablo," MARTIN RAOUF

BOURAIMA, and a/k/a "Raul," the defendants, who first entered the

United States in the Southern District of New York, and others

known and unknown, unlawfully, intentionally and knowingly did

combine, conspire, confederate and agree together and with each

other to violate the narcotics laws of the United States.

16.  It was a part and an object of the conspiracy that

MAROUN SAADE, WALID NASR, a/k/a "David Nasr," FRANCIS SOUROU

-16-

AHISSOU, a/k/a "Francois," CORNEILLE DATO, a/k/a "Pablo," and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendants, and others known and unknown, would and did distribute a controlled substance, intending and knowing that such substance would be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States, in violation of Sections 812, 959(a), and 960(a)(3) of Title 21, United States Code.

17.   The controlled substance involved in the offense was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Section 960(b)(1)(B) of Title 21, United States Code.

<u>Overt Acts</u>

18.   In furtherance of the conspiracy and to effect the illegal object thereof, MAROUN SAADE, WALID NASR, a/k/a "David Nasr," FRANCIS SOUROU AHISSOU, a/k/a "Francois," CORNEILLE DATO, a/k/a "Pablo," and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendants, and others known and unknown, committed the overt acts set forth in Paragraphs 13(a)-(t) of this Indictment, which are fully incorporated by reference herein.

(Title 21, United States Code, Section 963.)

<u>COUNT THREE</u>

<u>HEROIN IMPORTATION CONSPIRACY</u>

The Grand Jury further charges:

19.   The allegations set forth in Paragraphs One through Eighteen above are incorporated by reference as if set forth fully herein.

20.   From at least in or about June 2010, up to and including in or about February 2011, in an offense committed outside the territorial jurisdiction of the United States, MAROUN SAADE, WALID NASR, a/k/a "David Nasr," CORNEILLE DATO, a/k/a "Pablo," and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendants, who first entered the United States in the Southern District of New York, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

21.   It was a part and an object of the conspiracy that MAROUN SAADE, WALID NASR, a/k/a "David Nasr," CORNEILLE DATO, a/k/a "Pablo," and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendants, and others known and unknown, would and did distribute a controlled substance, intending and knowing that such substance would be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States, in violation of Sections 812, 959(a), and

960(a)(3) of Title 21, United States Code.

22.   The controlled substance involved in the offense was one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Section 960(b)(1)(A) of Title 21, United States Code.

<u>Overt Acts</u>

23.   In furtherance of the conspiracy and to effect the illegal object thereof, MAROUN SAADE, WALID NASR, a/k/a "David Nasr," CORNEILLE DATO, a/k/a "Pablo," and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendants, and others known and unknown, committed the overt acts set forth in Paragraphs 13(a)-(t) of this Indictment, which are fully incorporated by reference herein.

(Title 21, United States Code, Section 963.)

<u>COUNT FOUR</u>

<u>CONSPIRACY TO PROVIDE</u>
<u>MATERIAL SUPPORT TO TERRORISTS</u>

The Grand Jury further charges:

24.   The allegations set forth in Paragraphs One through Twenty-Three above are incorporated by reference as if set forth fully herein.

25.   From at least in or about June 2010, up to and including in or about February 2011, in an offense begun and committed outside of the jurisdiction of any particular State or

district of the United States, MAROUN SAADE, WALID NASR, a/k/a "David Nasr," ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," and ODED ORBACH, a/k/a "Dedy," a/k/a "Jesse," the defendants, at least one of whom was first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully and knowingly did combine, conspire, confederate and agree together and with each other to violate Section 2339A of Title 18, United States Code.

26.   It was a part and an object of the conspiracy that MAROUN SAADE, WALID NASR, a/k/a "David Nasr," ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," and ODED ORBACH, a/k/a "Dedy," a/k/a "Jesse," the defendants, and others known and unknown, would and did provide material support or resources, as that term is defined in Title 18, United States Code, Section 2339A(b) of Title 18, United States Code, to the Taliban, including, among other things, secure transportation and storage for shipments of cocaine and heroin in West Africa, money transfer services, weapons, and other material support and resources, knowing and intending that such support and resources were to be used in preparation for, in carrying out, and in concealing an escape from the commission of conduct constituting an offense against the United States, to wit:

  a.   murdering, attempting to murder, and conspiring to murder a national of the United States, in violation of Section 2332(a)(1) and (b) of Title 18, United States Code;

-20-

       b.    murdering, attempting to murder, and conspiring to murder an officer and employee of the United States Government and its agencies (including members of the uniformed services) while such officer and employee is engaged in and on account of the performance of official duties, and a person assisting such officer and employee in the performance of such duties or on account of that assistance, in violation of Sections 1114 and 1117 of Title 18, United States Code; and

       c.    maliciously damaging and destroying, and attempting to damage and destroy, by means of fire and an explosive, any building, vehicle, and other personal and real property in whole and in part owned and possessed by, and leased to, the United States, and any department and agency thereof, in violation of Section 844(f) of Title 18, United States Code;

in violation of Section 2339A of Title 18, United States Code.

<u>Overt Acts</u>

27.   In furtherance of the conspiracy and to effect the illegal object thereof, MAROUN SAADE, WALID NASR, a/k/a "David Nasr," ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," and ODED ORBACH, a/k/a "Dedy," a/k/a "Jesse," the defendants, and others known and unknown, committed the overt acts set forth in Paragraphs 13(a)-(t) of this Indictment, which are fully incorporated by reference herein, as well as the following additional overt acts:

       a.   On or about December 9, 2010, in Kiev, Ukraine, POURYAN participated in a consensually recorded meeting with CS-1 and CS-3 in which POURYAN discussed the kinds of

weapons he could provide, pricing and payment terms.

        b.   On or about December 10, 2010, in Kiev, Ukraine, POURYAN participated in a consensually recorded meeting with CS-1 and CS-3 in which POURYAN explained that he had access to a stock of weapons located in various countries, including Russian-made Igla SAMs, and could also offer advice regarding the suitability of particular weapons for various climates.  CS-3 explained that the weapons were needed to protect transportation routes and heroin laboratories in southeastern Pakistan from American attack.

        c.   On or about December 10, 2010, POURYAN sent an e-mail to CS-3 providing a list of various weapons and pricing, including automatic firearms and SAMs.

        d.   On or about December 17, 2010, ORBACH sent an e-mail to POURYAN, attaching a spreadsheet listing pricing and payment terms for various weapons, including automatic firearms and SAMs.

        e.   On or about February 9, 2011, in Bucharest, Romania, POURYAN and ORBACH participated in a consensually recorded meeting with CS-3, in which CS-3 informed POURYAN and ORBACH that the Taliban needed SAMs to protect their heroin laboratories from attacks by U.S. helicopters.  POURYAN and ORBACH told CS-3 that they could provide advice on which types of weapons to purchase.

f.    On or about February 10, 2010, in Bucharest, Romania, POURYAN and ORBACH participated in a consensually recorded meeting with CS-3, in which POURYAN and ORBACH discussed with CS-3 payment for, and delivery of, the weapons.

(Title 18, United States Code, Sections 2339A and 3238.)

<u>COUNT FIVE</u>

<u>CONSPIRACY TO ACQUIRE AND TRANSFER ANTI-AIRCRAFT MISSILES</u>

The Grand Jury further charges:

28.   The allegations set forth in Paragraphs One through Twenty-Seven above are incorporated by reference as if set forth fully herein.

29.   From at least in or about October 2010, up to and including the date of the filing of this Indictment, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, MAROUN SAADE, ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," and ODED ORBACH, a/k/a "Dedy," a/k/a "Jesse," the defendants, at least one of whom will be first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully and knowingly did combine, conspire, confederate and agree together and with each other to violate Section 2332g of Title 18, United States Code.

30.   It was a part and an object of the conspiracy that MAROUN SAADE, ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," and ODED ORBACH, a/k/a "Dedy," a/k/a "Jesse," the defendants, and others known and unknown, produced, constructed, otherwise acquired, transferred directly and indirectly, received, possessed, imported, and used (1) an explosive and incendiary rocket and missile that is guided by a system designed to enable the rocket and missile to seek and proceed toward energy radiated and reflected from an aircraft and toward an image locating an aircraft, and otherwise direct and guide the rocket and missile to an aircraft; (2) a device designed and intended to launch and guide said rocket and missile; and (3) a part and combination of parts designed and redesigned for use in assembling and fabricating said rocket, missile, and device; to wit, SAADE and POURYAN agreed to acquire and transfer surface-to-air missile systems to enable the Taliban to attack United States aircraft in Afghanistan, in violation of Title 18, United States Code, Section 2332g.

<u>Overt Acts</u>

31.   In furtherance of the conspiracy and to effect the illegal object thereof, MAROUN SAADE, ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," and ODED ORBACH, a/k/a "Dedy," a/k/a "Jesse," the defendants, and others known and unknown, committed the overt acts set forth in Paragraphs 13(k), 14(n), 14(p)-(q),

and 27(a)-(f) of this Indictment, which are fully incorporated by reference herein.

(Title 18, United States Code,
Sections 2332g(a)(1), (b), (c), and 3238.)

## FORFEITURE ALLEGATION

(As to Counts One, Two, and Three)

32. As a result of committing the controlled substance offenses alleged in Counts One, Two, and Three of this Indictment, MAROUN SAADE, WALID NASR, a/k/a "David Nasr," FRANCIS SOUROU AHISSOU, a/k/a "Francois," CORNEILLE DATO, a/k/a "Pablo," and MARTIN RAOUF BOURAIMA, a/k/a "Raul," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting or derived from any proceeds that the defendants obtained directly or indirectly as a result of the offenses and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offenses alleged in Counts One, Two, and Three of this Indictment, including, but not limited to, a sum of money representing the amount of proceeds obtained as a result of the offenses described in Counts One, Two, and Three of this Indictment.

## Substitute Assets Provision

33. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the

-25-

defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third person;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Sections 853(p) and 970, to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 and 970.)

## FORFEITURE ALLEGATION

### (As to Counts Four and Five)

34. As a result of planning and perpetrating the Federal crime of terrorism against the United States, citizens and residents of the United States, and their property alleged in Counts Four and Five of this Indictment, MAROUN SAADE, WALID NASR, a/k/a "David Nasr," ALWAR POURYAN, a/k/a "Allan," a/k/a "Alberto," and ODED ORBACH, a/k/a "Dedy," a/k/a "Jesse," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(G) and 2332b(g)(5), and Title 28, United States Code, Section 2461:

-26-

a.   all right, title, and interest in all assets, foreign and domestic;

b.   all right, title, and interest in all assets, foreign and domestic, affording a source of influence over the Taliban;

c.   all right, title and interest in all assets, foreign and domestic, acquired and maintained with the intent and for the purpose of supporting, planning, conducting, and concealing a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property; and

d.   all right, title and interest in all assets, foreign and domestic, derived from, involved in, and used and intended to be used to commit a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property;

including, but not limited to, a sum of money representing the value of the property described above as being subject to forfeiture.

(Title 18, United States Code, Section 981(a)(1)(G) and 2332b(g)(5) and Title 28, United States Code, Section 2461.)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

-27-

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

MAROUN SAADE,
WALID NASR,
a/k/a "David Nasr,"
FRANCIS SOUROU AHISSOU,
a/k/a "Francois,"
CORNEILLE DATO,
a/k/a "Pablo,"
MARTIN RAOUF BOURAIMA,
a/k/a "Raul,"
ALWAR POURYAN,
a/k/a "Allan," a/k/a "Alberto," and
ODED ORBACH,
a/k/a "Dedy," a/k/a "Jesse,"

Defendants.

### SUPERSEDING INDICTMENT

S1 11 Cr. 111 (NRB)

(18 U.S.C. §§ 2332g, 2339A;
21 U.S.C. §§ 960a & 963.)

Preet Bharara
United States Attorney.

A TRUE BILL

_____
Foreperson.

3-22-11
WO

Filed Indictment.

Francis
U S.M.J.