UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

         - v. -                          :                    S1 11 Cr. 111 (NRB)

MAROUN SAADE, et al.,                 :

           Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America


Christian R. Everdell
Aimee Hector
Glen A. Kopp
Assistant United States Attorneys
     - Of Counsel -

## <u>TABLE OF CONTENTS</u>

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Ahissou's Post-Arrest Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.    THE COURT'S EXERCISE OF JURISDICTION DOES NOT VIOLATE
        THE DUE PROCESS CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.    A Sufficient Nexus Connects Ahissou's Conduct to the United
            States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.    Jurisdiction Over Pouryan Was Not Improperly Manufactured . . . . . 18

    II.    AHISSOU'S STATEMENTS SHOULD NOT BE SUPPRESSED . . . . . . . . 23

    III.    THE COURT SHOULD NOT STRIKE THE REFERENCES IN THE . . . . . .
         INDICTMENT TO THE TALIBAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    IV.    AHISSOU'S MOTION TO SEVER COUNTS FOUR AND FIVE
         SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    V.    POURYAN'S REQUEST FOR EARLY DISCOVERY SHOULD
         BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

       - v. -                          :          S1 11 Cr. 111 (NRB)

MAROUN SAADE, et al.,                :

              Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

The Government respectfully submits this Memorandum of Law in opposition to the

pretrial motions filed on April 23, 2012, by defendant Francis Sourou Ahissou, and on May 1,

2012, by defendant Alwar Pouryan.  Ahissou has moved (i) to suppress his post-arrest statements

on the grounds that they were made involuntarily while he was suffering from insulin

deprivation; (ii) to dismiss Counts One and Two of the Indictment, claiming that there was an

insufficient nexus between the underlying criminal conduct and the United States, so that this

Court's exercise of jurisdiction would violate the Due Process Clause of the Fifth Amendment;

(iii) to sever Counts Four and Five of the Indictment; and (iv) to strike paragraph 1 of the

Indictment as surplusage.  Pouryan has moved (i) to dismiss the Indictment on the grounds that

the Government improperly manufactured jurisdiction; (ii) to strike all references to the history

and policies of the Taliban as surplusage; (iii) for early disclosure of 404(b) evidence; and (iv)

for an order directing the Government to produce numerous items which he classifies as *Brady* material.[1]

For the reasons set forth below, jurisdiction in this case was not manufactured and is entirely consistent with the Due Process Clause.  Accordingly, the defendants' motions to dismiss are meritless and should be denied.  Although the Government believes a hearing will be necessary to resolve Ahissou's motion to suppress his statements, the Government anticipates that the hearing will demonstrate that Ahissou's statements were voluntary and were not the product of improper coercion due to his alleged insulin deprivation.  The defendants' remaining motions to sever Counts Four and Five, to strike references to the Taliban in the Indictment, and to receive early discovery are either premature or should be denied on their merits.

## BACKGROUND

The defendants are named in a five-count superseding indictment (the "Indictment") returned on March 22, 2011.  Ahissou is charged in Counts One and Two of the Indictment, which allege that Ahissou participated in a narco-terrorism conspiracy, in violation of Title 21, United States Code, Section 960a (Count One), and a conspiracy to distribute cocaine knowing or intending that the cocaine would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a), 960(a)(3), 960(b)(1)(B), and 963 (Count Two). Pouryan is charged in Counts Four and Five of the Indictment, which allege that Pouryan participated in a conspiracy to provide material support to terrorists, in violation of Title 18,

---

[1]  Counsel for defendants Maroun Saade and Martin Raouf Bouraima have expressed to the Government that they wish to join the defendants' motions that apply to them.  The Government treats this as a request by Saade to join all of the motions except Ahissou's motions to suppress his post-arrest statements and to sever Counts Four and Five, and by Bouraima to join all of the motions except Ahissou's motion to suppress his post-arrest statements.

United States Code, Section 2339A (Count Four), and a conspiracy to acquire and transfer anti-aircraft missiles, in violation of Title 18, United States Code, Sections 2332g (Count Five).

The charges resulted from a 10-month undercover investigation in West Africa conducted by agents of the Drug Enforcement Administration ("DEA") that began in the Spring of 2010. During the course of the investigation, Ahissou met and communicated repeatedly with people he believed to be representatives or associates of the Taliban, and agreed to help them acquire and import large quantities of cocaine from West Africa into the United States and to use the proceeds from the drug sales to purchase weapons for the Taliban.  (Ind. ¶¶ 5, 13a, 13f-g, 13n-o, 13r, 13t).  Similarly, Pouryan met on several occasions with people he believed to be representatives or associates of the Taliban and offered to provide them military-grade weapons, including surface-to-air missiles ("SAMs"), knowing that the weapons would be used to protect Taliban heroin laboratories from American air strikes and to kill American soldiers in Afghanistan.  (Ind. ¶¶ 8, 13q, 27a-f).  As set forth in the Indictment, the Taliban have conducted numerous terrorist attacks on American soldiers and civilians in an effort to expel the United States and its allies from Afghanistan, and have used SAMs and other sophisticated military to carry out these attacks, which have included shooting down American aircraft.  (Ind. ¶ 2).

### A.     The Investigation

#### 1.     Narcotics Trafficking Activity Involving Ahissou

As part of the investigation, the DEA initially used two confidential sources ("CS-1" and "CS-2") to pose as representatives of the Taliban and meet with the defendants to discuss a proposed narcotics transaction.  On June 26, 2010, Ahissou and co-defendants Maroun Saade and Walid Nasr met with CS-1 and CS-2 in Ghana.  At the meeting, Saade told CS-1 and CS-2

that he could supply them with large quantities of Colombian cocaine and that Ahissou would be responsible for negotiating the sale of the cocaine.  CS-2 told Saade and Nasr that the Taliban were interested in setting up a transportation route for their heroin from Pakistan through West Africa.  Saade told CS-2 that he could receive the heroin and store it in safe houses in West Africa.  (Ind. ¶ 13a).

Throughout July and August 2010, Saade and Nasr had a series of telephone calls with CS-1 and CS-2, in which they further discussed the heroin and cocaine transactions.  The parties agreed to meet again in Ghana in late-August to negotiate the price of a one-kilogram sample of cocaine and to discuss the purchase of several hundred kilograms of cocaine in the event that the sample was acceptable.  (Ind. ¶¶ 13b-e).

Ahissou met first with CS-1 on August 24, 2010.  During the meeting, CS-1 told Ahissou that CS-2 wanted to export heroin from Pakistan and Afghanistan and wanted to establish a base of operations in West Africa to store the heroin so that it could be sent to the United States, Canada, and Europe to be sold to customers.  CS-1 further told Ahissou that CS-2 was a member of the Taliban and that the Taliban would receive the proceeds from the sale of the heroin. Ahissou agreed to try to find someone who could help transfer the drug proceeds out of the United States.  (Ind. ¶ 13f).  The following day, on August 25, 2010, Ahissou and Nasr met with CS-1.  During the meeting, CS-1, Ahissou, and Nasr discussed future purchases of cocaine. CS-1 stated that CS-2 would purchase approximately 300-500 kilograms of cocaine after receiving the sample.  CS-1 indicated that it would be the responsibility of Saade, Nasr, and Ahissou to get the cocaine into West Africa and that it would be CS-2's responsibility to get the cocaine out of West Africa.  Ahissou and Nasr agreed.  Nasr further explained that once the

cocaine arrived in West Africa, he, Saade, and Ahissou would rent several houses and store roughly 200-300 kilos of cocaine in each house.  (Ind. ¶ 13g).

A few days later, on August 29, 2010, Saade met on two separate occasions with CS-1 and CS-2.  During those meetings, CS-2 informed Saade that the Taliban were sending approximately two tons of heroin to Cotonou, Benin by boat and that CS-2 needed Saade to store the heroin and transport it from Benin to Ghana, where it could be loaded onto commercial airline flights bound for New York.  Saade agreed to handle the storage and transportation.  CS-1 and CS-2 further told Saade that all of the proceeds from the heroin sales in the United States would be going back to the Taliban and that they would use it to fight the Americans.  Saade responded that it would please him to support the Taliban's cause and stated that he had associates in the United States who could transfer the drug proceeds to West Africa.  Saade also discussed his capabilities for storing and transporting the heroin and laundering the proceeds back from the United States.  (Ind. ¶¶ 13h-i).  The meetings were followed by several phone calls between CS-1 and Saade in September 2010, in which Saade told CS-1 that he had approximately 300 kilograms of cocaine available for purchase in Cotonou, Benin, and that he would find a solution for CS-2 about how to safely transfer the heroin out of Africa.  (Ind. ¶ 13j).

The parties had another series of meetings in Benin in October 2010.  On October 5, 2010, Saade and another co-conspirator, Martin Raouf Bouraima, a/k/a "Raoul," met with CS-1 and CS-2.  At the meeting, Saade explained how the heroin shipment would be unloaded from the ship offshore using smaller fishing boats, and then transported to the storage houses by Bouraima, where Nasr would be in charge of its security.  CS-1 told Saade that the Taliban would use the drug proceeds to buy weapons to fight the Americans.  CS-1 then asked Saade if

he knew anyone that could supply weapons, including anti-aircraft missiles.  Saade responded

that he would inquire about getting anti-aircraft missiles and other weapons from Hezbollah in

Lebanon.  After the meeting, Saade, Bouraima, CS-1, and CS-2 traveled by car to inspect several

different houses that would be used to store the heroin.  (Ind. ¶ 13k).

       On October 6, 2010, Saade, Bouraima, and another co-conspirator, Corneille Dato, a/k/a

"Pablo," met with CS-1 and CS-2.  The next day, October 7, 2010, Bouraima and Dato had

another meeting with CS-1 and CS-2 without Saade.  At those meetings, Dato was introduced to

CS-1 and CS-2 as someone who could provide security for the drugs because of his contacts with

an individual who managed the harbor and the airports in Benin.  Dato told CS-2 that Saade had

informed him about the plan to move heroin into West Africa by ship, and that he would buy a

fishing boat to unload the ship containing the heroin offshore.  Dato and Bouraima indicated that

they understood that the heroin would be sent to New York, and that it would be their

responsibility to get the drugs to the airplanes.  Dato and Bouraima also indicated that they

understood that Saade's contacts in the United States would transfer the drug proceeds back to

West Africa where it would be used to buy weapons, and that Saade had already been in contact

with Hezbollah in Lebanon to arrange the weapons purchase.  (Ind. ¶¶ 13l-m).

       A few days later, on October 11, 2010, Saade, Nasr, and Ahissou met with CS-1.  At that

meeting, CS-1 explained to Saade and Nasr that CS-2 and the Taliban wanted to send someone

to meet with the arms dealers in Africa.  Saade said he could arrange the meeting and told CS-1

that CS-2 needed to send him a list of the weapons they wanted.  On October 13, 2010, Saade,

Nasr, and Ahissou met one final time with CS-1, and took CS-1 to a house where CS-1

purchased approximately 800 grams of cocaine for approximately $20,700 in cash.  (Ind. ¶¶ 13n-o).

Ahissou did not attend any further meetings with CS-1 and CS-2 after October 13, 2010, but spoke to CS-1 twice by phone on January 6, 2011 and January 19, 2011.  On the first call, CS-1 informed Ahissou that the cocaine sample purchased on October 13, 2010 had successfully reached the United States on a commercial airline flight from Ghana.  (Ind. ¶ 13r).  On the second call, Ahissou told CS-1 that he could assist in transferring the narcotics proceeds from the United States to Africa.  CS-1 told Ahissou that the Taliban needed the proceeds to purchase weapons, including SAMs, to protect their laboratories from American air attack.  (Ind. ¶ 13t).

### 2. Arms-Trafficking Activity Involving Pouryan

Pouryan entered the conspiracy in November 2010 in connection with the proposed arms purchase by CS-1 and CS-2.  On November 18, 2010, Saade and Nasr met with CS-1 in Ghana to discuss the upcoming meeting with the arms dealers.  Saade told CS-1 that one of the people that CS-1 would meet was a member of Hezbollah from Lebanon and the other was someone who sold weapons to Hezbollah.  Saade further told CS-1 that these men could sell them, among other things, anti-tank missiles, C4 explosives, and night vision equipment.  (Ind. ¶ 13p).

The meeting took place on November 20, 2010, in Ghana.  At the meeting were Saade, Nasr, and CS-1.  CS-1 brought two other DEA confidential sources ("CS-3" and "CS-4"), who posed as representatives of the Taliban.  Saade brought Pouryan, whom he introduced as "Allan," and another unidentified individual.  At the meeting, CS-3 told Pouryan that CS-3 and CS-4 worked for the Taliban and that the Taliban wanted modern weapons and training to be able to protect their heroin laboratories and to destroy American tanks.  Pouryan told CS-3 and

CS-4 that he could provide SAMs, anti-tank missiles, grenade launchers, AK-47s, M-16s, and other weapons, and discussed delivery and payment.  (Ind. ¶ 13q).

A few weeks after the initial meeting in Ghana, Pouryan again met with CS-1 and CS-3 in Kiev, Ukraine to discuss the weapons purchase.  At a meeting on December 9, 2010, Pouryan discussed the kinds of weapons he could provide, as well as pricing and payment terms.  (Ind. ¶ 27a).  At another meeting on December 10, 2010, Pouryan told CS-1 and CS-3 that he had access to weapons located in various countries, including Russian-made Igla SAMs, and could also offer advice regarding the suitability of particular weapons for various climates.  CS-3 explained to Pouryan that the weapons were needed to protect transportation routes and heroin laboratories in southeastern Pakistan from American attack.  (Ind. ¶ 27b).  After the second meeting, Pouryan sent an e-mail that same day to CS-3 attaching a list of various weapons that he could provide, including automatic firearms and SAMs. (Ind. ¶ 27c).  Approximately one week later, on December 17, 2010, Pouryan's co-conspirator, Oded Orbach, sent an e-mail to Pouryan attaching a spreadsheet listing pricing and payment terms for automatic firearms, SAMs, and other weapons.  (Ind. ¶ 27d).

Pouryan and Orbach engaged in a final series of meetings with CS-3 in Bucharest, Romania in February 2011.  At a meeting on February 9, 2011, CS-3 informed Pouryan and Orbach that the Taliban needed SAMs to protect their heroin laboratories from attacks by U.S. helicopters.  Pouryan and Orbach responded that they could provide advice on which types of weapons to purchase.  At another meeting with CS-3 the following day, Pouryan and Orbach further discussed payment and delivery of the weapons.  Pouryan and Orbach were arrested shortly after this meeting concluded.  (Ind. ¶¶ 27e-f).

### B.     Ahissou's Post-Arrest Statements

Ahissou was arrested on February 12, 2011, in Monrovia, Liberia by members of the Republic of Liberia National Security Agency pursuant to an arrest warrant issued on the basis of the Indictment.  Following his arrest, Ahissou was transported to Roberts International Airport where he was handed over to DEA agents, who escorted Ahissou onto a chartered airplane for expulsion to the United States along with co-defendants Saade, Nasr, Dato, and Bouraima. During the flight, Special Agents Christine Hanley and Sam Houston identified themselves to Ahissou as DEA agents and explained that he was being taken to the United States as a result of an arrest warrant issued out of the Southern District of New York.  Shortly thereafter, Special Agent Houston read Ahissou his *Miranda* rights in French using a printed *Miranda* warnings form.  Ahissou acknowledged that he understood his rights and expressed his willingness to answer questions.  Ahissou then made several statements to the DEA agents in response to questions posed by Special Agent Houston in French.  Ahissou was not interviewed again on the plane or after his arrival at White Plains Airport.  (*See* Stein Aff., Ex. A).

## DISCUSSION

## I.     The Court's Exercise of Jurisdiction Does Not Violate the Due Process Clause

Ahissou and Pouryan both move to dismiss the counts in which they are charged on due process grounds.  Ahissou argues that this Court's exercise of jurisdiction would violate the Due Process Clause because there is an insufficient jurisdictional nexus linking his underlying criminal conduct, all of which occurred overseas, to the United States.  (Ahissou Memo. at 3-6). Pouryan argues that the Government improperly manufactured jurisdiction in this case by unilaterally supplying the required nexus to the United States.  (Pouryan Memo. at 3-8).  Both

arguments are meritless.  As set forth below, the Indictment clearly alleges a sufficient link between Ahissou's conduct and the United States for this Court to exercise jurisdiction over him. Moreover, the Indictment clearly alleges numerous voluntary, affirmative acts that Pouryan took to advance the goals of the conspiracy, which included causing harm to Americans, negating any claim that jurisdiction was improperly manufactured.  Accordingly, the defendants' motion to dismiss should be denied.

A. **A Sufficient Nexus Connects Ahissou's Conduct to the United States**

1. **Applicable Law**

It is well established that, "as a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'" *United States* v. *Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (quoting *EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).  The Supreme Court itself has never suggested that the Due Process Clause limits Congress's authority to do so with respect to criminal statutes, but the Second Circuit has held that "'[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.'" *United States* v. *Yousef*, 327 F.3d at 111 (quoting *United States* v. *Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990)). While courts often refer to principles of international law in assessing the question of nexus, and primarily in assessing the expectations of criminal defendants, "[t]he ultimate question is whether defendant's conduct is not 'so unrelated to American interests as to render their [being sued] in the United States arbitrary or fundamentally unfair.'" *Goldberg* v. *UBS AG*, 690 F. Supp. 2d 92, 106, 108-111 (E.D.N.Y. 2010) (setting forth and defining the five recognized

-11-

principles of international law under which extraterritorial jurisdiction may be appropriate) (quoting *Yousef*, 327 F.3d at 112).

"For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *United States* v. *Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (citing *United States* v. *Peterson*, 812 F.2d 486, 494 (9th Cir.1987) ("Protective jurisdiction is proper if the activity threatens the security or government functions of the United States.")). It is immaterial for the purposes of establishing a sufficient jurisdictional nexus that the charges resulted from an undercover "sting" operation that focused solely on foreign citizens and took place entirely overseas, as long as the criminal activity "target[ed] United States citizens or interests or threaten[ed] the security or government functions of the United States." *Al Kassar*, 660 F.3d at 118. It is also immaterial that the criminal conduct at issue was a conspiracy that did not result in any appreciable harm to the United States or its citizens. *Id.* at 119. "Jurisdictional nexus is determined by the aims of the conspiracy, not by its effects." *Id.*

Courts in this Circuit have found sufficient nexus in a variety of factual circumstances. In *Yousef*, the Second Circuit held that the defendants' acts had a sufficient nexus to the United States where they "conspired to attack a dozen United States-flag aircraft in an effort to inflict injury on this country and its people and influence American foreign policy." *Yousef*, 327 F.3d at 112. "Given the substantial intended effect of their attack on the United States and its citizens," the Court reasoned, "it cannot be argued seriously that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." *Id.*

In *United States* v. *Jamal Yousef*, No. S3 08 Cr. 12131 (JFK) (involving a different defendant with the same last name), the defendant participated in a conspiracy to sell military-grade weapons that had allegedly been stolen from the American military in Iraq to a confidential informant posing as a FARC representative, knowing that the FARC engaged in large-scale cocaine trafficking in the United States.  2010 WL 3377499, at *1-*2 (S.D.N.Y. Aug. 23, 2010).  Although all of the co-conspirators' conduct occurred outside of the United States, Judge Keenan held that a sufficient jurisdictional nexus existed because, among other things, the defendant was aware that the organization he agreed to arm regularly smuggled large amounts of cocaine into the United States.  *See id.* at *4-*5.  Judge Keenan acknowledged that the defendant might not have acted "with the specific purpose of harming interests of or related to the United States," but he nonetheless found that the defendant "was aware that the charged conduct would have such an effect," and that was sufficient to exercise jurisdiction over him.  *Id.* at *4.[2]

In *United States* v. *Bout*, No. 08 Cr. 365 (SAS), the international arms trafficker, Viktor Bout, was charged with numerous offenses stemming from his agreement ro provide weapons to DEA confidential informants posing as FARC guerillas.  Like *Jamal Yousef*, the case arose from an undercover "sting" operation that targeted criminal conduct that occurred entirely outside of the United States.  Judge Scheindlin rejected the defendant's due process challenge to the district court's jurisdiction, holding that "[t]o prove a sufficient nexus to the United States, the evidence

---

[2]  Significantly, Judge Keenan made clear that subjective intent to cause effects in or on the United States, or subjective knowledge of such effects, was "sufficient but not necessary to justify the extraterritorial application of federal criminal law."  *Id.* at *4.  The Court noted that "[i]n determining whether a sufficient nexus exists, courts also have considered factors such as the 'defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and whether those acts could be expected to or did produce an effect in the United States.'"  *Id.* (quoting *Goldberg* v. *UBS AG*, 690 F. Supp. 2d 92, 106 (E.D.N.Y. 2010), and citing other cases).

-13-

need merely support the conclusion that [the defendant] was aware that the charged conspiracies would harm interests of or related to the United States," and an indictment's simple allegation of such knowledge is sufficient to withstand a motion to dismiss.  2011 WL 2693720, at *3-*4 (S.D.N.Y. July 11, 2011) (internal quotation marks and alterations omitted) (indictment alleged that defendant "offered to sell . . . weapons to the FARC after acknowledging . . . his understanding that the FARC intended to use those weapons to kill U.S. forces in Colombia").

Most recently, in *Al Kassar*, the Second Circuit upheld the district court's determination that the defendants' acts had a sufficient nexus to the United States where they conspired "to sell arms to [the] FARC with the understanding that they would be used to kill Americans and destroy U.S. property."  660 F.3d at 118.  In so holding, the Court noted that jurisdiction was appropriate because the aim of the conspiracy "was to harm U.S. citizens and interests and to threaten the security of the United States."  *Id.*

As these opinions indicate, the Due Process Clause has almost never been held to bar a criminal prosecution in an American court.  *See, e.g.*, *Jamal Yousef*, 2010 WL 3377499, at *3 n.1 ("The Court is not aware of any case in which a federal court has dismissed an action on the ground that the extraterritorial application of a federal statue violates the Due Process Clause."); *United States* v. *Ruemayr*, 530 F. Supp. 2d 1210, 1223 (D.N.M. 2008) ("[I]t appears that no federal court has invalidated the extraterritorial application of U.S. law on due process grounds."); *but see United States* v. *Perlaza*, 439 F.3d 1149, 1168-69 (9th Cir. 2006) (ordering

dismissal where Government conceded on appeal that it had neglected to present any evidence of nexus below).[3]

### 2.      Discussion

In this case, there is nothing "arbitrary or fundamentally unfair" about the exercise of U.S. jurisdiction over Ahissou, who took affirmative steps to assist people he believed to be representatives of the Taliban smuggle hundreds of kilograms of cocaine into the United States in order to raise money to buy weapons to fight American forces in Afghanistan.  According to the Indictment, at the meetings in June 2010 and August 2010, Ahissou agreed to negotiate the purchase of hundreds of kilograms of Colombian cocaine for CS-1 and CS-2, and to provide a sample of the cocaine at their request.  (Ind. ¶¶ 13a, g).  Ahissou further agreed to help store the cocaine in safe houses in West Africa, smuggle the cocaine out of West Africa into the United States, and launder the proceeds from the drug sales back to West Africa.  (Ind. ¶¶ 13a, f-g).  On October 13, 2010, Ahissou brought CS-1 to a location in Benin where CS-1 purchased an 800-gram sample of cocaine, which Ahissou was later told had been sent to the United States.  (Ind. ¶¶ 13o, r).  Moreover, Ahissou did all of this knowing that the people he was agreeing to assist were representatives of the Taliban, who wanted to use the proceeds from the sale of cocaine, as well as large quantities of heroin that they also intended to smuggle into the United States, to

---

[3]  *Perlaza* appears to be the only case in which a court found that due process barred prosecution of a crime committed outside the United States.  *Perlaza* is easily distinguished from the present case, as it involved the prosecution for possession with intent to distribute cocaine of the foreign crew of a Colombian ship, intercepted near South America (that is, nowhere near the territorial waters of the United States), where the Government, among other things, "did not present any evidence indicating that the cocaine . . . had any nexus to the United States."  *Id.* at 1169.

purchase SAMs and other military-grade weapons to protect their laboratories from American air attack.  (Ind. ¶¶ 13a, f, t).

In light of the foregoing, the nexus between Ahissou's conduct and the United States could not be more clear.  Ahissou's actions as part of this conspiracy, though committed entirely outside the United States, would have resulted in large quantities of narcotics flowing into the United States.  This, standing alone, would have had substantial detrimental effects on United States citizens.  Furthermore, Ahissou understood from his explicit discussions with CS-1 and CS-2 that the goal of the conspiracy was to generate proceeds from the sale of the narcotics that would have been used by the Taliban to purchase weapons to commit terrorist attacks on United States citizens; namely, to shoot down United States military aircraft seeking to destroy Taliban heroin laboratories in Afghanistan.  Accordingly, because it was entirely evident to Ahissou from the negotiations with CS-1 and CS-2 that the aim of the conspiracy was to "cause harm inside the United States" and to cause harm "to U.S. citizens [and] interests" abroad, the allegations in the Indictment are more than enough to establish a sufficient jurisdictional nexus to satisfy due process.  *Al Kassar*, 660 F.3d at 118; *see also Jamal Yousef*, 2010 WL 3377499 at *5 (jurisdictional nexus sufficient where defendant conspired to provide weapons to the FARC, knowing that "the FARC relies on Mexican drug cartels to transport narcotics into the United States," because the defendant was aware that "arming an international drug-trafficking organization which smuggles narcotics across United States borders would have a considerable effect on United States interests").

Ahissou's arguments to the contrary are mertiless.  Ahissou asserts that the exercise of jurisdiction in this case would be unfair because (i) he is a foreign citizen with no prior contacts

with the United States, and none of the underlying criminal conduct took place in the United States (Ahissou Memo. at 3), (ii) he is charged with conspiracy offenses that arose out of a fictional "sting" operation, and therefore his conduct had no potential to cause harm to United States citizens or interests (Ahissou Memo. at 4-6), and (iii) there is no evidence that he actually had the capability to do what he said he would – namely, provide hundreds of kilograms of cocaine and help smuggle them out of West Africa – or that he took any concrete steps to advance the goals of the conspiracy (Ahissou Memo. at 5-6).

The first two arguments are foreclosed by the Second Circuit's opinion in *Al Kassar*. The *Al Kassar* court held that it is irrelevant for the purposes of establishing a sufficient jurisdictional nexus that the charges resulted from an undercover "sting" operation that focused solely on foreign citizens and took place entirely overseas, as long as the criminal activity "target[ed] United States citizens or interests or threaten[ed] the security or government functions of the United States." *Al Kassar*, 660 F.3d at 118. The Court further held that it is irrelevant that the criminal conduct at issue was a conspiracy that did not result in any appreciable harm to the United States or its citizens because "[j]urisdictional nexus is determined by the aims of the conspiracy, not by its effects." *Id.* at 119. Here, it is clear that Ahissou understood that the goal of the conspiracy was to cause harm to United States citizens inside the United States and abroad. Hence, Ahissou's concerns about "where the line gets drawn" between extraterritorial cases where a nexus exists and where it does not (Ahissou Memo. at 4-5) are inapposite in this case where the goal of the conspiracy was to affect United States interests.

Ahissou's third argument is also meritless because it is not a challenge to the sufficiency of the allegations in the Indictment, but rather to the Government's proof at trial. Essentially,

-17-

Ahissou is asserting that he and his co-conspirators were bluffing about their capabilities at the meetings with CS-1 and CS-2 and did not have "the actual ability to sell vast quantities of cocaine as they had boasted." (Ahissou Memo. at 5). Even assuming that this were a viable trial defense, it is an issue of fact for the jury to determine at trial, and it is not, therefore, susceptible to pre-trial resolution on a motion to dismiss. *See Bout*, 2010 WL 2693720, at *5 & n.73. For these reasons, Ahissou's motion to dismiss Counts One and Two of the Indictment should be denied.[4]

### B.      Jurisdiction over Pouryan Was Not Improperly Manufactured

#### 1.      Applicable Law

Claims of "manufactured jurisdiction" in the Second Circuit originate from *United States* v. *Archer*, 486 F.2d 670 (2d Cir. 1973), a case in which federal agents orchestrated an elaborate sting targeting corrupt judges, defense counsel, and prosecutors in Queens County. In the course of creating fictitious criminal cases during the investigation, federal informants lied to local law enforcement officials, prosecutors, grand juries, and judges. So that otherwise state bribery offenses could be federally prosecuted under the Travel Act, 18 U.S.C. § 1952, the informants exchanged three interstate telephone calls with the targets to discuss the scheme. Reversing the convictions, the Court held that the interstate phone calls failed to satisfy the "use of a facility in

---

[4] Although it is not clear, Ahissou also appears to raise a claim of manufactured jurisdiction. (Ahissou Memo. at 5-6). To the extent he does raise this claim, it fails for the same reasons as Pouryan's claim. (*See* discussion *infra*). Among other things, having learned that CS-1 and CS-2 wanted to smuggle large quantities of cocaine into the United States to benefit the Taliban, Ahissou took the affirmative, voluntary step of bringing CS-1 to a location in Benin where CS-1 purchased an 800-gram sample of cocaine, so that it could be sent to the United States in order to further the goals of the conspiracy. (Ind. ¶¶ 13o, r).

interstate commerce" element under the Travel Act, because "the federal officers themselves supplied the interstate element," thus "[manufacturing] jurisdiction."  *Id.* at 682.

A little over 20 years later, in *United States* v. *Wallace*, 85 F.3d 1063, 1067 (2d Cir. 1996), the Second Circuit provided "a proper understanding of *Archer*'s limited precedential force," explaining as follows:

> Courts that have construed *Archer* have taken pains to limit its applicability, and to explain that 'manufactured jurisdiction,' as an independent doctrine is a dubious concept.  These cases make clear that the 'manufactured jurisdiction' concept is properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous; or (iii) an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime.

*Id.* at 1065-66 (citations omitted); *accord Al Kassar*, 660 F.3d at 119 (citing *Wallace*, 85 F.3d at 1065-66); *see also United States* v. *LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) (discussing *Archer*); *United States* v. *Lau Tung Lam*, 714 F.2d 209, 210-11 (2d Cir. 1983) (same).

Pouryan acknowledges that entrapment and outrageous government conduct are not at issue here.  (Pouryan Memo. at 3).  Instead, Pouryan confines his argument to the third theory of manufactured jurisdiction, asserting that the DEA confidential informants unilaterally supplied an essential element of the crime – namely, the jurisdictional nexus with the United States – by posing as members of the Taliban looking to purchase weapons to attack Americans.  (Pouryan Memo. at 3-8).  With respect to this theory, "even if the government initiates an essential element of the crime, jurisdiction is not manufactured if the defendant 'then takes voluntary

-19-

actions that implicate the [government-initiated] element.'" *Al Kassar*, 660 F.3d at 120 (quoting *Wallace*, 85 F.3d at 1066); *see also Wallace*, 85 F.3d at 1066 ("Courts have refused to follow *Archer* when there is *any* link between the federal element and a voluntary, affirmative act of the defendant." (emphasis added))*; United States* v. *Lau Tung Lam*, 714 F.2d at 210-11 (finding *Archer* inapplicable where the defendant, who had previously distributed drugs only within Europe, demonstrated in response to Government inducement his "willing[ness] to bring narcotics to this country for sale"); *Bout*, 2011 WL 2693720, at *4-*5 (describing the inapplicability of *Archer*-type arguments in an international terrorism sting case); *United States* v. *Umeh*, 762 F. Supp. 2d 658, 665-66 (S.D.N.Y. 2011) (holding that indictment's allegation of knowing and voluntary actions by the defendants that implicate federal elements of the charged crimes is sufficient to defeat motion to dismiss).

## 2.    Discussion

Pouryan asserts that, according to the allegations in the Indictment, it was the DEA confidential informants, and not any of the co-conspirators, who introduced into the negotiations that the weapons were for the Taliban to use against Americans.  Pouryan argues that the Indictment is therefore insufficient to establish jurisdiction because it does not allege any facts showing that he "made 'a voluntary or affirmative act' to implicate the 'federal element' of the crime."  (Pouryan Memo. at 6).

This assertion is plainly contradicted by the Indictment.  According to the Indictment, when Pouryan was informed by CS-1, CS-3, and CS-4 at the November 20, 2010 meeting that they represented the Taliban who wanted weapons and training in order to protect their heroin laboratories and destroy American tanks, Pouryan responded by offering to provide them with a

host of military-grade weapons, including SAMs, anti-tank missiles, grenade launchers, AK-47s, M-16s, and discussed delivery and payment options.  (Ind. ¶ 13q).  Pouryan continued to negotiate the proposed weapons transaction in the months that followed by meeting repeatedly with CS-1 and CS-3 in various locations.  (Ind. ¶¶ 27a-b) (meetings in December 2010 in Kiev, Ukraine); (Ind. ¶¶ 27e-f) (meetings in February 2011 in Bucharest, Romania).  At those meetings, Pouryan explained the types of weapons he could provide, how much the weapons cost, where the weapons were located, and even offered advice regarding the suitability of particular weapons for various climates.  (Ind. ¶¶ 27a-b, 27e-f).  Pouryan also sent an e-mail to CS-3 attaching a list of various weapons that he could provide, which included automatic firearms and SAMs (Ind. ¶ 27c).  In addition, the Indictment alleges that Pouryan was taking independent steps to complete the weapons transaction that were entirely separate and apart from his interactions with the DEA confidential sources.  For example, on December 17, 2010, Pouryan's co-conspirator Oded Orbach, sent an e-mail to Pouryan attaching a spreadsheet listing pricing and payment terms for automatic firearms, SAMs, and other weapons.  (Ind. ¶ 27d).  Pouryan also brought Orbach to the final series of meetings in February 2011 to finalize the deal.  (Ind. ¶¶ 27e-f).

Accordingly, although Pouryan is correct that it was the DEA confidential informants who initially injected the federal element that the weapons would go to the Taliban to attack Americans, Pouryan proceeded with the deal anyway and took numerous "voluntary actions that implicate[d] the [government-initiated] element."  *Al Kassar*, 660 F.3d at 120 (quoting *Wallace*, 85 F.3d at 1066).  As in *Al Kassar*, the DEA confidential informants simply created the opportunity for Pouryan to engage in criminal conduct by asking him to provide SAMs and other

military-grade weapons.  *Id*.  And like the defendants in *Al Kassar*, Pouryan responded to this request "by conspiring . . . to acquire and sell these weapons to what they believed was a terrorist organization with knowledge that the weapons would be used to kill Americans."  *Id.*  Hence, the allegations in the Indictment establish every element of the crimes charged against Pouryan "by evidence of voluntary action by the defendant[]."  *Id.*  That is all that is required to assert jurisdiction under the Due Process Clause.  *Id*.; *accord Bout*, 2011 WL 2693720, at *5 (denying motion to dismiss where defendant took "active steps" to consummate the sale of weapons to the FARC, after being advised that the weapons would be used to kill U.S. nationals); *Umeh*, 762 F. Supp. 2d at 665 (denying motion to dismiss where, according to the indictment, defendant was told the aircraft he provided would be used to transport drugs to the United States).

Pouryan's attempt to distinguish *Al Kassar* is unpersuasive.  Pouryan claims that the critical distinction between his conduct and that of *Al Kassar* is that Al Kassar agreed to provide weapons to a terrorist organization "*because he wanted* the weapons to be used in fights with American soldiers."  (Pouryan Memo. at 7) (emphasis in original).  In other words, Pouryan claims that jurisdiction can only exist if the defendant "embraces and adopts" the ideological goals of the terrorist group he is agreeing to assist.  That argument is meritless.  Pouryan's motive for engaging in criminal conduct is not an element of the crimes with which he is charged, and is not something that the Government would have to establish at trial.  Moreover, a defendant's motive is irrelevant to the question of whether jurisdiction can be properly exercise consistent with the Due Process Clause.  *See Jamal Yousef*, 2010 WL 3377499, at *4 (even if defendant did not act "with the specific purpose of harming interests of or related to the United

States" jurisdiction is proper if he "was aware that the charged conduct would have such an effect"). Accordingly, Pouryan's motion to dismiss Counts Four and Five should be denied.

## II.     Ahissou's Statements Should Not Be Suppressed

Ahissou seeks to suppress the statements he made on the flight from Monrovia to White Plains on February 12, 2011, on the grounds that they were not made voluntarily. Specifically, Ahissou asserts that he was experiencing symptoms of insulin deprivation that were "readily observable" at the time he was interviewed, and argues that the DEA agents improperly exploited his condition to obtain his statements involuntarily. (Ahissou Aff. ¶¶ 5-7; Ahissou Memo. at 1-2). The Government believes that Ahissou's affidavit is not credible and that the testimony of the agents at the hearing will demonstrate that Ahissou's statements on February 12, 2011 were made voluntarily after he had knowingly waived his *Miranda* rights, and were not the result of alleged insulin deprivation or improper coercion by DEA agents. Nevertheless, the Government acknowledges that Ahissou has raised material issues of fact concerning his statements that require a hearing, and will call witnesses at the hearing to establish that Ahissou's statements were voluntary and are admissible.

### A.     Applicable Law

It is well settled that a defendant's confession may be used against him in a criminal proceeding only if that confession is made voluntarily. *Green* v. *Scully*, 850 F.2d 894, 900 (2d Cir. 1988). A confession is "involuntary" within the meaning of the Fifth Amendment if it is obtained by "'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will'" *Oregon* v. *Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes* v. *Washington*, 373 U.S. 503, 515 (1963)).

Hence, a confession is involuntary only when it results from police coercion, even when the defendant is seriously ill or has a diminished mental state.  *See Colorado* v. *Connelly*, 479 U.S. 157, 167-69 (1986) (noting that "mental condition is surely relevant to an individual's susceptibility to police coercion," but holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"); *United States* v. *Salameh*, 152 F.3d 88, 118 (2d Cir. 1998) ("'A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective.'" (quoting *United States* v. *Chrisman*, 965 F.2d 1465, 1469 (7th Cir. 1992)).

When a confession is obtained by interrogation of a defendant who is in custody, the government must demonstrate that the defendant was informed of, and validly waived, his Fifth Amendment rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966).  To prove a valid waiver of *Miranda* rights, the Government must show, by a preponderance of the evidence, that the defendant relinquished his rights voluntarily and that the defendant had a full awareness of the right being waived and the consequences of waiving that right.  *See United States* v. *Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995); *Colorado* v. *Connelly*, 479 U.S. at 167-69.  Where the totality of the circumstances reveals an uncoerced choice and the requisite level of comprehension, a court may conclude that *Miranda* rights have been waived.  *See Moran* v. *Burbine*, 475 U.S. 412, 421 (1986).  Factors that courts should consider when evaluating the totality of the circumstances include (1) the conduct of the law enforcement officers, (2) the conditions of the interrogation, and (3) the background of the accused.  *United States* v. *Valdez*, 16 F.3d 1324, 1329 (2d Cir. 1994) (citing *United States* v. *Anderson*, 929 F.2d 96, 99 (2d Cir.1991)).  These circumstances are relevant, however, only as they pertain to the critical issue of whether the defendant's will

-24-

was "overborne" by the conduct of law enforcement officers such that his statements cannot be deemed to be "the product of a rational intellect and a free will."  *Lynumn* v. *Illinois*, 372 U.S. 528, 534 (1963) (citations omitted).

Following these principles, courts in this Circuit and elsewhere have routinely found that *Miranda* waivers and confessions were made voluntarily, even when the defendants have been sick, seriously injured, or in considerable pain, if the surrounding circumstances indicated that the defendants acted freely and without coercion by law enforcement agents.  *See, e.g.*, *United States* v. *Knorr*, No. 04 Cr. 406, 2005 WL 356803, at *2 (S.D.N.Y. Feb. 14, 2005) ("Defendant's allegation that he was too hung over, sick and tired to fully understand the proceedings is ... insufficient, absent police misconduct, to make out a Miranda violation."); *Pritchett* v. *Portuondo*, No. 02 Civ. 0824 (MBM) (GWG), 2003 WL 22472213, at *6 (S.D.N.Y. Oct. 31, 2003) (holding that petitioner's *Miranda* waiver, made while in the hospital recovering from "serious injuries" was valid); *United States* v. *Feola*, 651 F.Supp. 1068, 1119 (S.D.N.Y.1997) (finding that "a confession offered under the pangs of heroin withdrawal, in the absence of coercive police activity, is not involuntary for Miranda purposes"); *Campaneria* v. *Reid*, 891 F.2d 1014, 1029 (2d Cir. 1989) (statement given by defendant in intensive care unit held to be voluntary where defendant, despite being in significant pain, was alert and awake, and showed no signs of being "unduly susceptible to manipulation by his interrogators"); *United States* v. *Cristobal*, 293 F.3d 134, 143-44 (4th Cir. 2002) (confession given by seriously injured patient following emergency surgery voluntary where patient never indicated a desire for questioning to stop and account was lucid and detailed); *United States* v. *Martin*, 781 F.2d 671, 673-74 (9th

Cir.1985) (statement made while suffering great pain and under the influence of Demerol found

voluntary where accused was awake and relatively coherent).

**B.    Expected Evidence at Hearing**

As discussed above, the Government expects the evidence at the hearing to show that

before questioning Ahissou on the flight from Monrovia to White Plains on February 12, 2011,

the DEA agents fully advised him of his *Miranda* rights in French, which he indicated he

understood.  Ahissou then indicated that he was willing to answer questions and proceeded to

make statements to the DEA agents in French.  The Government also expects that the evidence

will show that Ahissou appeared lucid and coherent throughout the advice of rights and the

interview, that he responded appropriately to questions and did not express any discomfort or

illness, and that the DEA agents did not coerce Ahissou into waiving his *Miranda* rights or

answering questions.  The Government also expects that the evidence will show that the DEA

agents treated Ahissou professionally and with courtesy at all times, including offering him

water and food on several occasions.  Accordingly, Ahissou's statements should not be

suppressed.

**III.   The Court Should Not Strike the References in the Indictment to the Taliban**

Pursuant to Federal Rule of Criminal Procedure 7(b), Pouryan and Ahissou request that

that the Court strike references in the Indictment to the Taliban.  (Pouryan Memo. at 8; Ahissou

Memo. at 6-7 (specifically requesting to strike paragraph 1 of the Indictment)).  These requests

should be denied.

**A.    Applicable Law**

"'Motions to strike surplusage from an indictment will be granted only where the
challenged allegations are not relevant to the crime charged and are inflammatory and
prejudicial.'" *United States* v. *Mulder*, 273 F.3d 91, 99-100 (2d Cir. 2001) (emphasis added)
(quoting *United States* v. *Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990)).  Therefore "[i]t has long
been the policy of courts within the Southern District to refrain from tampering with
indictments." *United States* v. *Tomero*, 496 F. Supp. 2d 253, 255 (S.D.N.Y. 2007) (quotation
marks omitted) (citing *United States* v. *Bin Laden*, 91 F. Supp. 2d 600, 601 (S.D.N.Y. 2000)).
"'If evidence of the allegation is admissible and relevant to the charge, then regardless of how
prejudicial the language is, it may not be stricken.'" *Scarpa*, 913 F.2d at 1013 (quoting *United
States* v. *DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y.1978)).  Given that these standards are
"exacting," *Scarpa*, 913 F.2d at 1013 (internal quotation marks omitted), "only rarely is alleged
surplusage stricken from an indictment." *United States* v. *Gotti*, 42 F. Supp.2d 252, 292
(S.D.N.Y. 1999) (internal quotation marks omitted).

      **B.**    **Discussion**

      The defendants fail to establish that the references in the Indictment to the Taliban are
irrelevant, inflammatory and prejudicial.  The information that the defendants seeks to strike
from the Indictment pertaining to the Taliban's goals and ideology are plainly relevant to the
charges in this case.  The preamble of the Indictment consists of two paragraphs containing a
description of the Taliban's ideology (Ind. ¶ 1), and its post-2001 conflict with the United States,
including its means and methods for combating United States armed forces in Afghanistan.  (Ind.
¶ 2).  Where, as here, the charges against the defendants include conspiracy to provide material
support to terrorists (Pouryan and Saade), conspiracy to acquire and transfer anti-aircraft missiles

(Pouryan and Saade), and conspiracy to commit narco-terrorism (Ahissou, Saade, and Bouraima), language describing the Taliban's terrorist ideology and historical acts of anti-American violence provide helpful background for the jury and are relevant to establishing elements of the charged crimes.  Indeed, Ahissou concedes this, noting that paragraph 2 of the Indictment need not be struck because of its relevance to the narco-terrorism charge.  (Ahissou Memo. at 7).

The defendants' request to strike this purported "surplusage" from the Indictment should also be denied because the references to the Taliban of which they complain, are not "inflammatory and prejudicial" in the context of the charges in this case and the anticipated evidence at trial.  The fact that the organization that the defendants sought to support – namely, the Taliban – has been involved in various terrorist acts is no more inflammatory or prejudicial than the proof of the defendants' own actions that are plainly relevant to the charged conduct.

## IV.    Ahissou's Motion to Sever Counts Four and Five Should be Denied

Ahissou also moves to sever Counts Four and Five of the Indictment, which charge Saade, Pouryan, and Orbach with conspiracy to provide material support to terrorists and conspiracy to acquire and transfer anti-aircraft missiles, respectively.[5]  Ahissou argues that severance of these counts is necessary to protect his rights under the Speedy Trial Act because of a hypothetical delay that may be caused by Pouryan's need for additional time to prepare his defense, or as-yet non-existent pre-trial litigation related to Pouryan under the Classified

---

[5]  Nasr is also charged in Count Four, but he has already pled guilty and is not proceeding to trial.

Information Procedures Act.  (Ahissou Memo. at 6).  Because Ahissou's concerns of prejudicial

delay are entirely speculative at this point, his motion for severance should be denied.

A.    **Applicable Law**

Rule 14(a) of the Federal Rules of Criminal Procedure provides:

> If it appears that a defendant or the government is prejudiced by a
> joinder of offenses or defendants in an indictment . . . or by such
> joinder for trial together, the court may order an election or
> separate trials of counts, grant a severance of defendants or
> provide whatever other relief justice requires.

Although a motion to sever is "committed to the sound discretion of the trial court," *United*

*States* v. *Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989), the presumption in favor of joint trials

is so strong that "[t]he principles that guide the district court's consideration of a motion for

severance usually counsel denial," *United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

That presumption "is particularly strong where, as here, the defendants are alleged to

have participated in a common plan or scheme."  *United States* v. *Salameh*, 152 F.3d 88, 115 (2d

Cir. 1998).  "The Supreme Court has instructed that a district court should grant a Rule 14

severance motion only when 'there is a serious risk that a joint trial would compromise a specific

trial right of one of the defendants, or prevent the jury from making a reliable judgment about

guilt or innocence.'"  *United States* v. *Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *Zafiro*

v. *United States*, 506 U.S. 534, 539 (1993)); *see also United States* v. *Ventura*, 724 F.2d 305,

312 (2d Cir. 1983) (where "defendants . . . are jointly indicted [they] should be jointly tried");

*United States* v. *Bin Laden*, 109 F. Supp. 2d 211, 214 (S.D.N.Y. 2000) ("When more than one

defendant is accused of participating in the same act or transaction or series of acts or

transactions, federal law expresses a strong preference for a single, joint trial of all defendants." (footnote omitted)), *aff'd*, 552 F.3d 93 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 2778 (2009).

The strong institutional considerations underlying this settled principle were explained by the Supreme Court as follows:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.  Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability — advantages which sometimes operate to the defendant's benefit.  Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson* v. *Marsh*, 481 U.S. 200, 209-210 (1987); *see also Zafiro* v. *United States*, 506 U.S. at 537; *United States* v. *Lyles*, 593 F.2d 182, 191 (2d Cir. 1979) (presumption in favor of joint trials "conserves judicial resources, alleviates the burden on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials").

The Speedy Trial Act, 18 U.S.C. § 3161 et seq., requires that a defendant's trial begin within 70 days after his indictment or his first appearance before a judicial officer, whichever is later. 18 U.S.C. § 3161(c)(1).  The Speedy Trial Act specifically lists a number of periods of delay that are excluded from calculating the 70-day period, including a "reasonable period of delay when the defendant is joined for trial with a co-defendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(6).  The Second Circuit has held that cases involving multiple defendants are ordinarily governed by a single

speedy trial clock and that delay attributable to any one defendant is charged against the single clock, thus making the delay applicable to all defendants.  *See United States* v. *Pena*, 793 F.2d 486, 489 (2d Cir.1986); *United States* v. *Piteo*, 726 F.2d 50, 52 (2d Cir.1983).  "The only inquiry made in such multiple defendant cases is whether the delay is 'reasonable.'"  *United States* v. *Gambino*, 59 F.3d 353, 362 (2d Cir.1995).

Here, Ahissou raises an entirely speculative concern that pre-trial discovery and litigation relating to Pouryan will unreasonably delay the trial.  Ahissou does not, and cannot, know whether Pouryan will require any more time to prepare his defense than the other defendants in this case, or whether the Government will need to invoke the Classified Information Procedures Act.  Hence, Ahissou offers no concrete basis upon which to grant severance.  Furthermore, it bears noting that Ahissou is the only defendant to have requested a suppression hearing prior to trial.  Accordingly, any delay in the immediate future is more appropriately attributed to the preparation of his own defense, not that of Pouryan.  For these reasons, Ahissou's motion to sever is, at the very least, premature and should be denied.[6]

## V.       Pouryan's Request for Early Discovery Should be Denied

Pouryan requests that the Government disclose (i) materials pursuant to Federal Rules of Criminal Procedure 403 and 404(b) concerning prior bad act evidence that the Government intends to use at trial one month in advance of trial; and (ii) any exculpatory material pursuant to

---

[6] This case is unlike *United States* v. *Darius Byrd*, 466 F. Supp. 2d 550 (S.D.N.Y. 2006), which Ahissou cites in support of his argument.  In that case, the defendant was charged with a number of co-defendants who, unlike the defendant, were eligible for the death penalty, and the Government needed several months at least to determine whether it would seek the death penalty as to those defendants.  Under these circumstances, Judge Rakoff granted severance to avoid the likely prospect that the defendant would not receive a trial "until years after indictment."  466 F. Supp. 2d at 553.

*Brady* v. *Maryland*, 373 U.S. 83 (1963).  (Pouryan Memo. at 9-13).  For the reasons set forth

below, the requests should be rejected.

### A.      Prior Bad Act Evidence

Pouryan's request for the Court to set a deadline for the Government to disclose prior bad

act evidence under Federal Rule of Criminal Procedure 403 and 404(b) is premature.  Federal

Rule of Evidence 404(b) provides no deadline for notification, instead requiring only that the

Government provide "*reasonable* notice in advance of trial, or during trial, if the court excuses

pretrial notice on good cause shown" of its intent to use evidence of other crimes, wrongs, and

bad acts.  Fed. R. Evid. 404(b) (emphasis added).  Here, there is no trial date and the

Government is still determining what 404(b) evidence, if any, it will seek to introduce at trial.

Therefore, it would be premature to order that 404(b) notice be given at this early date.  Once a

trial date is set, the Government will provide sufficiently timely disclosure to give the defense an

opportunity to challenge the admission of any such evidence and the Court to make appropriate

findings.

### B.      *Brady* Material

Under the Due Process Clause of the United States Constitution, the Government has a

duty to disclose favorable evidence to the accused where such evidence is "material" either to

guilt or to punishment.  *See Brady*, 373 U.S. at 87.  Favorable evidence includes evidence that

tends to exculpate the accused, *see id.*, as well as evidence that is useful to impeach the

credibility of a government witness.  *See Giglio* v. *United States*, 405 U.S. 150, 154 (1972).  As

the Second Circuit has explained, *Brady* and *Giglio* material must be provided by the

Government "in time for its effective use at trial."  *In re United States (United States v. Coppa)*,

267 F.3d 132, 142 (2d Cir. 2001); *see also id.* ("the prosecutor must disclose . . . exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made").

As the Government has stated in its March 15, 2011 discovery letter to the defendant, the Government is aware of its continuing obligation to disclose *Brady* material. Other than what has already been provided in discovery, the Government is unaware of any *Brady* material in this case. Should the Government learn of any *Brady* material in the future, we will produce it promptly.

Because the Government has made a good-faith representation to the Court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*, the defendant's request should be denied. *See, e.g., United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of Brady material based on Government's representations that "it is aware of its obligations under Brady . . . and will produce any Brady material to the defense well before trial"); *United States* v. *Yu*, No. 97 CR 102 (SJ), 1998 WL 57079, at *4-*5 (E.D.N.Y. Feb. 5, 1998) (denying defense request that Government provide early disclosure of *Brady* material because Government acknowledged its continuing obligation to provide exculpatory material upon its discovery and assured that it would comply with that obligation); *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

Further, many of the requested materials Pouryan lists in his memorandum are more appropriately categorized as *Giglio* or 3500 material. All requests for these materials are premature. The law is clear that the Government is under no obligation under the Jencks Act,

Section 3500 of Title 18, United States Code, to produce prior statements of its witnesses until

after each has testified on direct examination.  The Jencks Act provides in pertinent part:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500.

Courts in this Circuit have consistently held that the district court lacks the power to

mandate early production of Jencks Act material.  *See, e.g.*, *United States ex rel. Lucas* v. *Regan*,

503 F.2d 1, 3 n.1 (2d Cir. 1974); *In re United States*, 834 F.2d 283, 287 (2d Cir. 1987); *United*

*States* v. *Ortiz-Montoya*, No. 93 Cr. 0050 (RWS), 1995 WL 37841, at *1 (S.D.N.Y. Jan. 31,

1995); *United States* v. *McGuinness*, 764 F. Supp. 888, 896 (S.D.N.Y. 1991); *see also* Fed. R.

Crim. P. 16(a)(2) ("Nor does this rule authorize the discovery or inspection of statements made

by any prospective government witnesses except as provided in 18 U.S.C. § 3500.").

Similarly, courts in this Circuit have repeatedly refused to compel disclosure of

impeachment or *Giglio* material well in advance of trial.  In *United States* v. *Coppa*, the Second

Circuit held that the Government is not required to produce *Giglio* material until it produces

"3500 material" pursuant to the Jencks Act, so long as the Government provides the *Giglio*

material in time for its effective use at trial.  267 F.3d at 145-46; *see also United States* v. *Nixon*,

418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient

to require its production in advance of trial"); *United States* v. *Greyling*, 00 Cr. 631 (RCC), 2002

WL 424655, at *2 (S.D.N.Y. Mar. 18, 2002) (production of *Giglio* material by the Wednesday

-34-

before the week in which a witness will testify is appropriate); *Gallo*, 1999 WL 9848, at *7-*8 (denying defendants' motions to require the early production of *Giglio* and 3500 material based on Government's representations that it would provide the information sufficiently in advance of each witness's testimony to allow adequate time to prepare for cross-examination); *United States* v. *Mejia*, No. 98 Cr. 4, 1998 WL 456257, at *1 (S.D.N.Y. Aug. 5, 1998) (denying defendant's motion to compel all impeachment material under *Giglio* based on the Government's representations that it would make such information available at the time that it provides 3500 material).

However, in order to avoid any adjournment or delay in the trial which might conceivably occur if Jencks Act and *Giglio* material were not produced until after the Government's witnesses have testified, the Government will adhere to its customary practice of producing impeachment material at the same time as Jencks Act material, *i.e.*, shortly before the beginning of trial, or, if additional time is reasonably required to review such material, sufficiently in advance of the witness's testimony so as to avoid any delay at trial.  This practice will allow defense counsel adequate time to prepare for cross-examination of Government witnesses as they come up at trial.  Accordingly, the defendant's motion for the early production of *Giglio* and Jencks Act material should be denied.

**CONCLUSION**

For the reasons set forth above, the defendants' motions to dismiss Counts One, Two, Four, and Five of the Indictment are meritless and should be denied.  Although Ahissou's motion to suppress his post-arrest statements ultimately will be shown to be meritless, the Government consents to a factual hearing on that claim.  The defendant's remaining motions should be denied.

Dated: New York, New York
       May 18, 2012

                                 Respectfully submitted,

                                 PREET BHARARA
                                 United States Attorney
                                 Southern District of New York


                         By: _____/s/_____
                                 Christian R. Everdell/Aimee Hector/Glen A. Kopp
                                 Assistant United States Attorneys
                                 (212) 637-2556/2203/2210

<u>AFFIRMATION OF SERVICE</u>

Christian R. Everdell, pursuant to Title 28, United States Code, Section 1746, hereby

declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney

for the Southern District of New York.

That on May 18, 2012, I caused one copy of the within Government's Memorandum of

Law in Opposition to Defendants' Pretrial Motions to be filed on ECF and thereby to be

delivered by electronic mail to:

> Sabrina Shroff, Esq.
> sabrina_shroff@fd.org
>
> Joel Stein, Esq.
> jmsteinesq@aol.com
>
> Bertram Okpokwasili, Esq.
> bertramco@gmail.com
>
> Richard Rosenberg, Esq.
> richrosenberg@msn.com
>
> Lee Ginsberg, Esq.
> leeloulaw@aol.com
>
> Steven Frankel, Esq.
> FrankelRudd@aol.com

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. §

1746.

_____/s/_____
Christian R. Everdell
Assistant United States Attorney
(212) 637-2556

Dated:  New York, New York

May 18, 2012