UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA            :

   - v. –                              :          S6 11 Cr. 111 (NRB)

ODED ORBACH,                         :

                                   :
                Defendant.
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney
Southern District of New York

CHRISTIAN EVERDELL
AIMEE HECTOR

Assistant United States Attorneys
   - Of Counsel -

1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA        :

       - v. –                   :        S6 10 Cr. 162 (KMW)

ODED ORBACH,                    :

              Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
```

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of Oded Orbach, which is scheduled for December 18, 2013, at 4:00 p.m., and in response to Orbach's sentencing letter of December 12, 2013 ("Deft. Sent. Ltr."). On April 15, 2013, following a nine-day bench trial, Your Honor found Orbach guilty of one count of providing material support to terrorists, namely, the Taliban; and of one count of conspiring to acquire and transfer surface-to-air missiles. The missiles were intended to be supplied to purported representatives of the Taliban, to kill American soldiers in Afghanistan. The applicable Guidelines sentence for the defendant's crimes is life imprisonment, and conviction for the conspiracy to transfer surface-to-air missiles carries a twenty-five year mandatory minimum sentence. As set forth below, the nature, circumstances, and seriousness of Orbach's crimes call for a lengthy sentence consistent with the applicable Guidelines range. The Government recognizes, however, that a sentence of less than life could be sufficient to meet the goals of sentencing under Title 18, United States Code, Section 3553(a).

## II. CRIMINAL CONDUCT

### A. Orbach and Pouryan Early Weapons Trafficking

The conduct for which Orbach was convicted in April 2013 was not his first foray into the international weapons trafficking business. Orbach and his co-defendant, Alwar Pouryan, negotiated weapons transactions months before they conspired to arm the Taliban in late 2010 – the conduct for which they were convicted. In April 2010, Pouryan received an inquiry from his future father-in-law, Hassan Chokr. Chokr asked if Pouryan could fulfill an order from an embargoed African country for weapons, including automatic pistols and parts for AK-47 assault rifles. (*See* Trial Transcript ("Tr.") at 541-44). Within an hour of Chokr's inquiry, Pouryan forwarded the request to Orbach, who immediately began to reach out to his contacts in the weapons trafficking business to source the requested items. (*Id*. at 544-47). Through a series of e-mail communications with weapons brokers, Orbach obtained offers from suppliers to provide the weapons that the client sought. (*Id*. at 548-550; 556-70). The deal, however, was temporarily put on hold.

Similarly, in September 2010, Pouryan received a request for weapons from a contact in the Sudan. (*Id*. at 570-72). As before, Orbach was Pouryan's connection to suppliers to fulfill the request. (*Id*. at 573-75). Once again, Orbach immediately contacted individuals with access to weapons and obtained an offer from a supplier to provide grenade launchers, shotguns, training pistols, and grenades. (*Id*. at 582-89).

### B. The Taliban Weapons Deal

In the fall of 2010, in the course of an investigation in West Africa focused on narcotics trafficking, confidential sources working for the Drug Enforcement Administration ("DEA") and posing as Taliban representatives (collectively, the "Confidential Sources") asked co-defendant

3

Maroun Saade to put them in touch with individuals who could supply weapons for the Taliban. (Tr. at 284-85). In November 2010, in Accra, Ghana, Saade introduced the Confidential Sources to Pouryan as someone who could supply weapons. (Government Exhibit ("GX") 101-T). During the meeting, Pouryan and the confidential source known as "Yianni," who purported to be a Taliban financier, discussed the Taliban's need to modernize its arsenal and to obtain surface-to-air missiles to protect its heroin laboratories in Afghanistan. (Tr. at 291, 589-98). Pouryan confirmed that he had the ability to supply these kinds of weapons and agreed to continue the negotiations with Yianni. (*Id*.). Notably, Pouryan promised to maintain confidentiality in his dealings and emphasized that he was not interested in knowing who Yianni's clients were because he was just "selling something to some guy." (*Id*.). To Pouryan, the transaction was just a business deal, and the identity of the customer was not as important as getting the deal done.

Immediately following the meeting in Ghana, Pouryan contacted his business partner and weapons-contact, Orbach, to inform him that he had a new potential client for their weapons business. (*Id*. at 599-600). Specifically, Pouryan advised Orbach that the client was looking for, among other things, automatic weapons, anti-aircraft missiles and anti-tank missiles. (*Id*. 600-03). Orbach immediately went to work pricing the weapons, while Pouryan continued the negotiations with Yianni. (*Id*. at 603-05). In the meantime, Pouryan and Yianni maintained communications with each other via e-mail and telephone to set up a second set of meetings in Kiev, Ukraine to further the negotiations for the weapons deal. (*Id*. at 606-10). By December 4, 2010, Orbach had prepared a detailed price list for the weapons that the Taliban requested. (*Id*. at 610-12).

4

In early December 2010, in Kiev, Pouryan attended two meetings with Yianni and another Confidential Source. At the second meeting, on December 10th, Pouryan explained his method of doing business. At this meeting, Pouryan provided information about his partner, who would play an integral role of the weapons' transaction. According to Pouryan, his partner could explain the details of the transaction to Yianni, including the financing for the transaction, and the methods of delivery of the weapons. (*Id*. at 616-19). The partner, who would be personally introduced at a subsequent meeting, turned out to be Orbach.

Following the meeting, at Pouryan's suggestion, Pouryan and Yianni maintained contact via draft e-mails to avoid leaving a trail of incriminating communications. Although the communications between Pouryan and Yianni appeared on their face to be written by Pouryan, evidence at trial demonstrated that the communications were actually drafted by Orbach, who was more knowledgeable about weapons prices, and then placed in a draft e-mail folder for Yianni to review. For example, on December 17, 2010, Orbach sent Pouryan a memo entitled "Memo Systems cost December 17." (*Id*. at 626-28). The memo listed the weapons requested by Yianni for the Taliban and a host of associated military hardware, including Stinger anti-aircraft missiles, Javelin missiles, M47 Dragon anti-tank missiles, handguns and 40 mm grenade launchers. The total price for the order was over $12,000,000, and with a commission of 5.75%, Pouryan and Orbach stood to make over $700,000. (*Id*.).

Before meeting with Yianni again, Orbach and Pouryan worked on budgeting for the Taliban weapons deal, which was one of several deals that they had in the pipeline for a security and weapons trafficking business that they were developing. An internal budget document that Orbach drafted and provided to Pouryan projected that the Taliban deal would generate revenue for their business and help them recover their personal investments in the company. (*Id*. at 633-

36; GX 230-A). As Orbach and Pouryan sought to grow and finance their business, the earlier separate weapons deal from the spring of 2010 re-entered the picture. (*Id*. at 637-42). The client was still in the market for weapons, so Orbach and Pouryan sought to execute the deal to provide a package of weapons that was worth $30,000,000. (*Id*.)

With the Taliban deal in the works, and the embargoed African nation deal back in the picture, Orbach reached out to weapons suppliers to fulfill his clients' needs. For example, Orbach emailed a Russian arms production company, Izhmash, regarding AK-47 assault rifles, "specialty equipment," and ammunition. (*Id*. 644-45; GX 235). Orbach also e-mailed a contact associated with a private security firm based in the Dominican Republic, in an effort to locate weapons that could be purchased. (Tr. at 656-57; GX 243; GX 307-C; GX 307-C-aa-1 to 12). Orbach's e-mail attached a document entitled, "Memo Shopping List," which contained a list of military grade weapons that Yianni, the purported Taliban financier, had asked Pouryan for, including 50 caliber rifles, Night vision goggles, M16s, Glock handguns, and 40 mm grenade launchers. (*Id*.). The list also included the types of weapons that the embargoed African nation was trying to procure through Orbach and Pouryan. (*Id*.).

In a draft e-mail that Orbach and Pouryan left for Yianni, on January 23, 2011, Orbach and Pouryan "officially confirmed" an early February meeting in Bucharest, Romania with Yianni. (Tr. at 655; GX 242 and 508). In the e-mail, they assured Yianni that the newer Javelin missiles could be available for purchase but that they did not want to discuss the issue over e-mail.[1] (*Id*.)

---

[1] The parties agreed at trial, via stipulation, that "Javelin" can refer to a United States-designed, portable anti-tank missile, or a British-designed, portable, heat-seeking, surface-to-air missile, and that later-developed models of the British-made Javelin surface-to-air missile were called the "Starburst" and the "Starstreak." (GX 1007).

The final meetings on the Taliban weapons deal took place in a hotel room in Bucharest, Romania on February 9 and February 10, 2011. (GX 104-T). Yianni and Pouryan were joined for the first time by Orbach. Yianni explained that he wanted the weapons delivered to the port of Constanta, Romania and described the need for the Taliban to receive training on the new weaponry. (Tr. at 664-68). Orbach represented that he and Pouryan could "fix" the Taliban's problem through a training program. (*Id*. at 668). The defendants further discussed their ability to sell the Taliban Javelin anti-aircraft missiles and the difference in price between the anti-tank Javelin missile and the anti-aircraft Javelin missile. (*Id*. at 670-72). The defendants and Yianni also discussed a payment mechanism. Orbach described his system for discrete cash payments in Europe which would avoid the need for wires that could be traced to the defendants. (Tr. at 683-88; GX 104-T at 52). The deal was set. Yianni made clear that the Taliban would pay for the weapons from its heroin sales. (GX 104-T at 57). Finally, it was agreed that at a meeting the next day, Yianni would provide a cash payment to the defendants. (Tr. at 687; GX 104-T at 65).

In between the first and second meetings in Bucharest, Orbach and Pouryan continued to take steps to execute the deal with Yianni. Orbach sent Pouryan an e-mail attaching an updated list of weapons and ammunition for Yianni, along with a detailed payment schedule. (Tr. at 691-92; 294-95; GX 250; GX 251). In total, the cost of the weapons sought by the Taliban was $25,000,000. (*Id*.). Orbach also provided Pouryan with information about the port of Constanta as a viable location for the delivery of the Taliban's weapons, just as Yianni had asked. (Tr. at 692-93; GX 301-J).

The following day, on February 10, 2011, Orbach and Pouryan again met with Yianni at the Bucharest City Hotel. (GX 105-T). Orbach confirmed the date of the first delivery of the weapons, and discussed with Yianni the details of the weapons training package that Orbach and

7

Pouryan would provide for the Taliban. (GX 105-T at 12-13). Orbach and Pouryan explained that they added a component part – a camera – for the Javelin missile system to the weapons list, "increasing" the total price of the deal. (GX 105-T at 22-23). Orbach also provided Yianni with a breakdown of the ammunition list and a proposed payment schedule. (GX 105-T at 28-32). Finally, Yianni advised Orbach and Pouryan that, as he promised them the day before, he would be giving them 250,000 Euros after the meeting. (GX 105-T at 41-43). In fact, at the end of the meeting, Orbach and Pouryan were arrested.

### IV.   THE PRESENTENCE INVESTIGATIVE REPORT

The Probation Office issued its Presentence Investigation Report ("PSR") in this case on August 22, 2013. In the PSR, the Probation Office calculated an offense level of 45, a Criminal History Category of I, and a resulting applicable Guidelines range of life imprisonment. The Probation Office recommends a sentence of fifteen-years for Count IV and twenty-five years for Count V, the mandatory minimum for the missile trafficking offense, to be served concurrently.

### V.   ARGUMENT

The offense conduct in this case is gravely serious -- providing material support to the Taliban through the provision of deadly weapons and training, and conspiring to sell the Taliban surface-to-air missiles with knowledge that the missiles would be used to kill Americans in Afghanistan. The conduct plainly calls for a lengthy sentence.

**A.   Applicable Sentencing Law**

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult"

the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 50 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain

9

cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 522 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B.      The Nature, Circumstances, and Seriousness of the Offense Necessitate a Significant Sentence**

Orbach committed very serious offenses, with potentially devastating consequences, without regard not for the American lives at stake, but rather only for his own financial gain. As such, his conduct in this case warrants a lengthy prison sentence.

It is of course a serious crime to provide weapons of any type, and in any quantity, to individuals who intend to use them in connection with acts of violence. Here, Orbach, a naturalized United States citizen, agreed to sell large quantities of lethal military-grade weaponry, including anti-tank and surface-to-air missiles, and did so believing that the weapons would end up in the hands of the Taliban, and would be used to kill American soldiers in Afghanistan. These weapons are capable of inflicting devastating injury and loss of life. Orbach participated in this transaction despite his own claims to have been seriously and detrimentally affected by acts of violence in his own life. Indeed, Orbach did not participate passively in this criminal conduct, but drew on his own experience and expertise to offer advice on the types of

weapons that would be most useful for the Confidential Sources, and agreed to provide training in the use of the weapons so that the Taliban could employ them to their maximum destructive effect. Orbach's eagerness to provide military-grade weapons to an organization that has engaged in acts of terrorism is simply appalling.

Furthermore, this was not the first time Orbach had negotiated a weapons transaction. He was actively pursuing opportunities to build a security business for just that purpose. Just a few months before the Taliban weapons deal, Orbach worked to provide firearms to an embargoed West African country and to the Sudan. In fact, the evidence at trial established that at the time the Taliban deal arose, Orbach and Pouryan were in the process of forming a fledgling security services business called "Kit and Boodle." Orbach provided the business savvy necessary to carry out the Taliban deal, creating pricing lists and spreadsheets that broke down in detail the costs of the weapons and the profit that they expected to make from the transaction. Orbach also drafted operating budgets for their various other business projects, which showed that they needed the Taliban deal to succeed in order to keep them financially afloat. In short, Orbach and Pouryan viewed the Taliban deal as a chance to make hundreds of thousands of dollars and save their floundering businesses – without any regard to the potential loss of American lives. Orbach's conduct is shocking and merits a lengthy prison sentence.

C.     **The Defendant's Arguments Do Not Justify a Reduced Sentence**

Defendant advances two arguments in mitigation of Orbach's culpability. Neither counsel in favor of leniency in this case.

First, the defense maintains that Orbach never intended to carry out the weapons transaction that he negotiated with the Confidential Source, and believed that his activities were sanctioned by the United States government, positions that were flatly rejected by this Court and

11

exhibit a continued lack of remorse or acceptance of responsibility for his offense. (Tr. at 1267-68). As demonstrated at trial, Orbach's actions throughout the course of the conspiracy exhibited nothing short of a desire and drive to complete the weapons transaction and to reap the resulting financial rewards, which would not only line his own pockets but also bolster his fledgling private security business. For example, Orbach reached out to suppliers to actually source the requested weapons; created business plans and budgetary documents projecting anticipated earnings from the Taliban weapons deal; and even revised the pricing spreadsheet during the evening between the meetings in Bucharest on February 9 and 10, 2011, in order to account for a new camera component that he proposed should be added to the Javelin missile system that had been proposed. (GX 230, 234, 105-T at 22-23). This conduct, like all of the internal documentation and communications between Pouryan and Orbach, evinced nothing short of a clear intention to carry out the weapons deal. Further, the fact that Orbach had not actually purchased the weapons from suppliers at the time of his arrest is neither surprising nor suggestive of a lack of intention to go through with the deal, given that he had not yet received the down payment that he expected to receive on February 10th, when he was arrested.

Further, there is simply no evidence to suggest that Orbach believed that his actions were, via Pouryan, sanctioned by United States government officials. ( Deft. Sent. Ltr. at 7). In fact, there is nothing in the nature or substance of Orbach and Pouryan's direct communications regarding the deal to suggest that it was being carried out on behalf of the U.S. government. Rather, both employed tactics to ensure that the deal remained covert, including by utilizing draft emails and coded communications; both undertook efforts to actually source the illicit weapons for delivery to the purported Taliban representatives; and both anticipated a huge payday at the end of the deal, once the weapons had been delivered into the hands of individuals intent on

harming Americans. Orbach's continued insistence that he was nothing more than an innocent participant, with only the best intentions of actually benefiting the U.S. government, is in the teeth of this Court's verdict, and suggests a complete lack of remorse for his reprehensible conduct.

Second, the defendant asserts that his personal characteristics – primarily emotional and psychological harm he claims to have suffered from traumatic experiences growing up in Israel and his time in the Israeli Army – warrant a significant downward variance. While the experiences recounted certainly warrant sympathy, the circumstances the defendant suffered as a child and young adult do not merit a reduction in his sentence in this case, especially given the severity of the crimes, the defendant's role in the offenses, and the lack of any bona fide nexus between the traumas of his youth and the adult crimes of which he now stands convicted.

In addition, although the Guidelines are advisory, the policy statements set forth in the Guidelines regarding departure should be considered by the Court when determining whether a non-Guidelines sentence is appropriate pursuant to consideration of § 3553(a) factors. United States v. Rattoballi, 452 F.3d 127, 136 (2d Cir. 2006) ("Although the district court is not required to adhere to the policy statements promulgated by the Commission, we do consider them in reviewing a sentence for reasonableness."). The Guidelines caution that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range" U.S.S.G. § 5H1.3. While the Second Circuit has allowed downward departures "in extraordinary circumstances" of childhood trauma where "extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense," United States v. Rivera, 192 F.3d 81, 85 (2d Cir. 1999), the Second Circuit historically has limited this downward departure only to situations in which the impaired mental

13

and emotional condition resulting from the defendant's childhood abuse actually led the defendant to commit the offense at issue. United States v. Brady, 417 F.3d 326, 334-35 (2d Cir. 2005) ("the requirement of a causal nexus restricts the circumstances in which a departure on the grounds of abuse is permitted only to cases where the abuse brings about a mental condition that leads to or causes the criminal conduct." (citing United States v. Reinoso, 350 F.3d 51, 58 (2d Cir. 2003) (emphasis added)).

Accordingly, even if the defendant demonstrated that his mental or emotional condition had been impaired in some capacity as a result of his childhood, he fails to demonstrate a causal connection between his impairment and the offense at issue. Brady, 417 F.3d at 335. There are no facts in the PSR or the defendant's submission that show that his emotional or mental condition led him to conspire to provide material support, in the form of military grade weaponry, to an organization bent on harming Americans in Afghanistan. In fact, if anything, one would think that the very opposite would be true – that Orbach's personal experiences with the devastation that can be caused through the use of explosives or weapons would have caused him to reject participation in the criminal conduct for which he was convicted. Orbach's conduct is not mitigated by the history he recounts, and is deserving of significant punishment, although the Government recognizes that a sentence below the Guidelines of life could be sufficient to accomplish the goals of sentencing under Title 18, United States Code, Section 3553(a).

## VI. CONCLUSION

For the reasons set forth above, the Court should impose a significant sentence that reflects the nature, circumstances, and seriousness of his criminal conduct.

Dated:    New York, New York
          December 16, 2013

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States of America


                                  By:        /s/
                                        Christian Everdell / Aimee Hector
                                        Assistant United States Attorneys
                                        Tel.:  (212) 637-2556/2203

**Affirmation of Service**

AIMEE HECTOR, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury, that she is employed as an Assistant U.S. Attorney in the Southern District of New York, and that, on December 16, 2013, she caused copies of The Government's Sentencing Memorandum for Oded Orbach to be served via electronic notification and email:

>Steven K. Frankel, Esq.
>325 Broadway, Suite 502
>New York, NY 10007

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: New York, New York
       December 16, 2013

>/s/
>AIMEE HECTOR
>Assistant United States Attorney